PITTSBURGH &c. RAILWAY *v.* BOARD OF PUBLIC
WORKS OF WEST VIRGINIA.[1]

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE DISTRICT OF WEST VIRGINIA.

No. 8. Submitted January 25, 1898. — Decided November 28, 1898.

The collection of taxes assessed under the authority of a State is not to be
    restrained by writ of injunction from a court of the United States, unless
    it clearly appears, not only that the tax is illegal, but that the owner of
    the property taxed has no adequate remedy by the ordinary processes of
    the law, and that there are special circumstances bringing the case within
    some recognized head of equity jurisdiction.
A railroad bridge across a navigable river forming the boundary line be-
    tween two States is not, by reason of being an instrument of interstate
    commerce, exempt from taxation by either State upon the part within it.
A railroad bridge is taxable under the Code of West Virginia of 1891, c. 29,
    § 67; and, although the board of public works assesses separately the
    whole length of the railroad track within the State, and that part of the
    bridge within the State, yet, if the railroad company does not, as allowed
    by that section, apply to the auditor to correct any supposed mistake in
    the assessment, nor appeal, within thirty days after receiving notice of
    the decision of the board, to the circuit court of the county, and the
    officers of the State make no attempt to interfere with the company's
    possession and control of its real estate, nor, until after the expiration
    of the thirty days, either to impose a penalty for delay in paying the
    taxes, or to levy on personal property for non-payment of them, the
    company cannot maintain a bill in equity in a court of the United States
    to restrain the assessment and collection of any part of the taxes.

THE Pittsburgh, Cincinnati, Chicago and St. Louis Railway
Company, a corporation of the State of Ohio, owning and
operating a railway running through the States of West Vir-
ginia, Ohio, Pennsylvania, .Indiana and Illinois, under the
laws of those States, and crossing the Ohio River, a navigable
stream, forming the boundary between the States of West Vir-

---

[1] The docket title of this case is — " The Pittsburgh, Cincinnati, Chicago
and St. Louis Railway Company *v.* The Board of Public Works of the State
of West Virginia."

ginia and Ohio, by means of a bridge built, owned and controlled by the plaintiff, filed in the Circuit Court of the United States for the District of West Virginia a bill in equity against the Board of Public Works of the State of West Virginia, a public corporation, against its members individually, (being the governor, the auditor, the treasurer, the superintendent of free schools and the attorney general of the State,) and against one Cowan, sheriff of Brooke County, all of them citizens of that State, to restrain the assessment and collection of taxes upon the bridge under section 67 of chapter 29 of the Code of West Virginia of 1891.

The bill alleged that, under and by virtue of that section of the Code, the plaintiff was required, through its principal officers, to make return in writing, under oath, to the auditor of the State, on or before the 1st of April in each year, and in the manner prescribed by that section, of its property subject to taxation in the State; the auditor was required to bring the return, as soon as practicable, before the board of public works; that board was authorized either to approve the return, or to proceed to assess and fix the fair cash value of all the property of railroad companies which they were so required to return for taxation; and it was further provided that, as soon as possible after the value of any railroad property was fixed for purposes of taxation by one of the several methods designated by that section, the auditor should assess and charge such property with the taxes properly chargeable thereon.

The bill also alleged that the plaintiff's main line of railway ran through the State of West Virginia for a distance of 7.11 miles, of which 6.53 miles were in the county of Brooke and 0.58 miles in the county of Hancock; that its bridge across the Ohio River was part of its railway; that the total length of the bridge, including its abutments, was 2044 feet, of which 1518 feet were in West Virginia and 526 feet in Ohio; and that the plaintiff, before April 1, 1894, as required by section 67 of chapter 29 of the Code, made to the auditor of the State of West Virginia a return of its property subject to taxation in the State for the year 1894, (a copy of which was

annexed to and made part of the bill, and is set out in the margin,[1]) and, in making that return, included, in the 7.11 miles of its main track, so much of the bridge as lay within the State, amounting to 1518 feet.

The bill further alleged that some time in September, 1894, the board of public works, meeting at Charleston in that State, as provided by that section of the Code, to assess and fix the

---

[1] Valuation of P., C., C. & St. L. R'y Main Line in the State of West Virginia as returned for Taxation for the Year 1894.

Brooke County.   Cross Creek district:

| | | | | |
|---|---|---|---|---|
| Main track ............ 6.53 miles at | $13,000 | 00 = | $84,890 | 00 |
| Second track........... 6.53 " " | 4,000 | 00 = | 26,120 | 00 |
| Side track..............12.62 " " | 2.500 | 00 = | 31,550 | 00 |
| Rolling stock........... 6.53 " " | 3,567 | 78 = | 23,298 | 00 |
| Telegraph line.......... 6.53 " " | 100 | 00 = | 653 | 00 |
| Supplies and tools.............................. | | | 1,306 | 00 |
| Station house at Colliers....................... | | | 1,300 | 00 |
| Water tank       "       "       ......................... | | | 400 | 00 |
| Sand house       "       "       ......................... | | | 50 | 00 |
| Car house       "       "       ......................... | | | 100 | 00 |
| Trainmen's house       "       ......................... | | | 950 | 00 |
| Scale house at       "       ......................... | | | 100 | 00 |
| Tower west of       "       ......................... | | | 450 | 00 |
| Tower at New Cumberland Junction.............. | | | 800 | 00 |
| Station at Hollidays Cove....................... . | | | 180 | 00 |
| Station at Wheeling Junction.................... | | | 400 | 00 |
| Total listed value for Brooke County................... | | | $172,547 | 00 |

Hancock County.   Butler district:

| | | | | |
|---|---|---|---|---|
| Main track.............. 0.58 miles at | $13,000 | 00 = | $7,540 | 00 |
| Second track........... 0.58 " " | 4,000 | 00 = | 2,320 | 00 |
| Side tracks............. 0.95 " " | 2,500 | 00 = | 2,375 | 00 |
| Rolling stock........... 0.58 " " | 3,567 | 00 = | 2,069 | 00 |
| Telegraph line.......... 0.58 " " | 100 | 00 = | 58 | 00 |
| Supplies and tools............................. .... | | | 116 | 00 |
| Total listed value for Hancock County................ | | | 14,478 | 00 |
| Total listed value of main line........................ | | | $187,025 | 00 |

Summary of Mileage.

| | |
|---|---|
| Main track................................................ | 7.11 miles. |
| Second track............................................. | 7.11 " |
| Side tracks............................................... | 13.57 " |
| Rolling stock............................................. | 7.11 " |
| Telegraph line............................................ | 7.11 " |

valuation of railroad property for the purposes of taxation, refused to approve the plaintiff's return, and proceeded, among other things, to assess the plaintiff with 6.53 miles of main track and 6.53 miles of second track in the county of Brooke, which assessment and valuation covered the entire length of its railroad in the State of West Virginia, including so much of the bridge as lay within the State; and, in addition thereto, valued and assessed the bridge, as a separate structure, at the sum of $200,000, placing the tax upon the bridge at $3060, and the auditor proceeded to assess the plaintiff with this sum of $3060; thereby assessing it with the entire length of the bridge in West Virginia as a part of its railway in the State, and also assessing it with the bridge as a separate structure, thus taxing the plaintiff a second time for that part of its bridge which lay in West Virginia; whereas the bridge should only have been assessed as so many feet of the railway.

The bill further alleged that neither the board of public works, nor any member thereof, nor the auditor, informed the plaintiff of the valuation which had been placed upon its property by the board for taxation, nor of the taxes which had been assessed thereon by the auditor; that on September 28, 1894, the plaintiff, not having been informed of the action of the board or of the auditor, addressed through its chief engineer a letter to the auditor, inquiring what action had been taken by the board of public works and the auditor with regard to the assessment of taxes on its property for 1894; that the letter was not answered, nor was any information in regard to the taxes given to the plaintiff until January 19, 1895, when it received from the auditor a statement showing that the board of public works had placed a separate and additional valuation of $200,000 upon the bridge for the purposes of taxation, and that the auditor had proceeded to assess and charge the plaintiff with the sum of $3060 as a tax for 1894 upon that valuation; and that on January 19, 1895, the auditor demanded of the plaintiff payment of that sum, and the plaintiff refused to pay it, but paid to the auditor the rest of the taxes assessed, amounting to the sum of $4187, upon a valua-

tion of $310,830, which included the plaintiff's railroad in the county of Hancock.

The bill further alleged that "on the — day of —— 1895 " the auditor added ten per cent to the sum of $3060, to pay the expense of collection, and certified that sum, with the ten per cent added, to the sheriff of Brooke County for collection; and that the sheriff "since said date " had demanded payment of the sum of $3060 and the ten per cent additional, and was threatening to collect them by legal process, and would thus inflict irreparable injury upon the plaintiff, unless prevented by the interposition of a court of competent jurisdiction.

The plaintiff further alleged that the bridge constituted a part of its line of railway, and had no separate earning capacity, and no greater earning capacity than any other equal number of feet of its line of railway, and was used exclusively by it in transporting freight and passengers across the Ohio River to and from the States of West Virginia and Ohio; and that it was advised and believed that the bridge was an instrument of interstate commerce, and was not, as a separate structure from its line of railway, a proper subject for taxation by the State of West Virginia in the manner above set forth.

The bill then charged that the tax upon the bridge was illegal and unjust, and constituted a cloud upon the title to the bridge, and that by reason of that clause of the Constitution of the United States, which gives Congress control over interstate commerce, the Circuit Court of the United States for the District of West Virginia was clothed with authority and jurisdiction to restrain and to prevent the assessment and collection of this illegal and unjust tax; and prayed for an injunction against its assessment and collection, and for further relief.

The bill was sworn to March 18, 1895 ; and was filed March 25, 1895, together with an affidavit to the effect that, since the bill was sworn to, the sheriff had levied upon one of the plaintiff's freight engines for the purpose of enforcing the collection of the tax upon the bridge. Upon the filing of the bill, a temporary injunction was granted as prayed for.

A general demurrer to the bill was afterwards filed and

sustained, the injunction dissolved, and the bill dismissed. The plaintiff appealed to this court, under the act of March 3, 1891, c. 517, § 5. 26 Stat. 828.

*Mr. J. Dunbar* and *Mr. J. B. Sommerville* for appellant.

*Mr. Edgar P. Rucker,* attorney general of the State of West Virginia, *Mr. T. S. Riley* and *Mr. Thayer Melvin* for appellee.

MR. JUSTICE GRAY, after stating the case, delivered the opinion of the court.

The collection of taxes assessed under the authority of a State is not to be restrained by writ of injunction from a court of the United States, unless it clearly appears, not only that the tax is illegal, but that the owner of the property taxed has no adequate remedy by the ordinary processes of the law, and that there are special circumstances bringing the case under some recognized head of equity jurisdiction. *Dows* v. *Chicago,* 11 Wall. 108; *Hannewinkle* v. *Georgetown,* 15 Wall. 547; *State Railroad Tax cases,* 92 U. S. 575; *Union Pacific Railway* v. *Cheyenne,* 113 U. S. 516; *Milwaukee* v. *Kœffler,* 116 U. S. 219; *Shelton* v. *Platt,* 139 U. S. 591.

In *Dows* v. *Chicago,* a citizen of the State of New York, owning shares in a national bank organized and doing business in the city of Chicago, filed a bill in equity, in the Circuit Court of the United States for the Northern District of Illinois, to restrain the collection of a tax assessed by the city of Chicago upon his shares in the bank, alleging, among other things, that the tax was illegal and void, because the tax was not uniform and equal with taxes on other property as required by the constitution of the State, and because the shares were taxable only at the domicil of the owner and therefore were not property within the jurisdiction of the State of Illinois. This court, speaking by Mr. Justice Field, without considering the validity of the objections to the tax, held that the bill could not be maintained, saying: "Assuming the tax to

be illegal and void, we do not think any ground is presented by the bill, justifying the interposition of a court of equity to enjoin its collection. The illegality of the tax and the threatened sale of the shares for its payment constitute of themselves alone no ground for such interposition. There must be some special circumstances attending a threatened injury of this kind, distinguishing it from a common trespass, and bringing the case under some recognized head of equity jurisdiction, before the preventive remedy of injunction can be invoked. It is upon taxation that the several States chiefly rely to obtain the means to carry on their respective governments, and it is of the utmost importance to all of them that the modes adopted to enforce the taxes levied should be interfered with as little as possible. Any delay in the proceedings of the officers, upon whom the duty is devolved of collecting the taxes, may derange the operations of the government, and thereby cause serious detriment to the public. No court of equity will, therefore, allow its injunction to issue to restrain their action, except where it may be necessary to protect the rights of the citizen whose property is taxed, and he has no adequate remedy by the ordinary processes of the law." 11 Wall. 109, 110. "The party of whom an illegal tax is collected has ordinarily ample remedy, either by action against the officer making the collection or the body to whom the tax is paid. Here such remedy existed. If the tax was illegal, the plaintiff protesting against its enforcement might have had his action, after it was paid, against the officer or the city to recover back the money, or he might have prosecuted either for his damages. No irreparable injury would have followed to him from its collection. Nor would he have been compelled to resort to a multiplicity of suits to determine his rights. His entire claim might have been embraced in a single action." 11 Wall. 112.

In the *State Railroad Tax cases*, this court, in a careful and thorough opinion delivered by Mr. Justice Miller, stated that " it has been repeatedly decided that neither the mere illegality of the tax complained of, nor its injustice nor irregularity, of themselves, give the right to an injunction in a

court of equity;" referred to section 3224 of the Revised Statutes, which provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court;" and said that "though this was intended to apply alone to taxes levied by the United States, it shows the sense of Congress of the evils to be feared if courts of justice could, *in any case,* interfere with the process of collecting the taxes on which the government depends for its continued existence." The court then quoted from *Dows* v. *Chicago,* and *Hannewinkle* v. *Georgetown,* above cited, and proceeded as follows: "We do not propose to lay down in these cases any absolute limitation of the powers of a court of equity in restraining the collection of illegal taxes. But we may say that, in addition to illegality, hardship or irregularity, the case must be brought within some of the recognized foundations of equitable jurisdiction; and that mere errors or excess in valuation, or hardship or injustice of the law, or any grievance which can be remedied by a suit at law, either before or after payment of taxes, will not justify a court of equity to interpose by injunction to stay collection of a tax. One of the reasons why a court should not thus interfere, as it would in any transaction between individuals, is that it has no power to apportion the tax or to make a new assessment, or to direct another to be made by the proper officers of the State. These officers, and the manner in which they shall exercise their functions, are wholly beyond the power of the court when so acting. The levy of taxes is not a judicial function. Its exercise, by the constitutions of all the States, and by the theory of our English origin, is exclusively legislative. A court of equity is, therefore, hampered in the exercise of its jurisdiction by the necessity of enjoining the tax complained of, in whole or in part, without any power of doing complete justice by making, or causing to be made, a new assessment on any principle it may decide to be the right one. In this manner, it may, by enjoining the levy, enable the complainant to escape wholly the tax for the period of time complained of, though it be obvious that he ought to pay a tax if imposed in the proper manner." 92 U. S. 613–615.

In *Union Pacific Railway Co.* v. *Cheyenne,* in which the Union Pacific Railway Company obtained an injunction against the levy of a tax by the city of Cheyenne, the facts were peculiar. The plaintiff, owning many lots of land in that city, had paid a tax assessed on all its property by a board of equalization under a general statute of the Territory of Wyoming, and had also been taxed by the city of Cheyenne under provisions of its charter which had been repealed by that statute; and the bill showed, as stated in the opinion, that the levy complained of "would involve the plaintiff in a multiplicity of suits as to the title of lots laid out and being sold; would prevent their sale; and would cloud the title to all its real estate." 113 U. S. 526, 527.

In *Shelton* v. *Platt,* 139 U. S. 591, the president in behalf of himself and other members of an express company, a joint stock company of the State of New York, filed a bill in equity in a Circuit Court of the United States in Tennessee to restrain the collection of a license tax upon the company under a statute of the State of Tennessee, alleged to be contrary to the Constitution of the United States. The bill averred that the comptroller had issued a warrant of distress to a sheriff to collect such taxes for two years, the sheriff had levied or was about to levy the warrant on the property of the company, and the comptroller was about to issue a like warrant to collect the tax for a third year; that the property of the company in Tennessee was employed in interstate commerce in the express business, and was necessary to the conduct of it; and that the seizure by the sheriff would greatly embarrass the company in the conduct of that business and subject it to heavy loss and damage, and the public served by it to great loss and inconvenience. This court held that, even if the statute was unconstitutional and the tax void, the bill could not be maintained, and, speaking by the Chief Justice, said: "The trespass involved in the levy of the distress warrant was not shown to be continuous, destructive, inflictive of injury, incapable of being measured in money, or committed by irresponsible persons. So far as appeared, complete compensation for the resulting injury could have been had by recovery of dam-

·ages in an action at law. There was no allegation of inability on the part of the express company to pay the amount of the taxes claimed, nor any averment showing that the seizure and sale of the particular property which might be levied on would subject it to loss, damage and inconvenience which would be in their nature irremediable." The court went on to say that another statute of the State (which had been adjudged by this court in *Tennessee* v. *Sneed,* 96 U. S. 69, to afford a simple and effective remedy) provided that where an officer charged by law with the collection of a tax took any steps to collect it, a party conceiving it to be unjust or illegal might pay it under protest and sue the officer to recover it back, and should have no other remedy by injunction or otherwise. The court observed that "legislation of this character has been called for by the embarrassments resulting from the improvident employment of the writ of injunction in arresting the collection of the public revenue; and, even in its absence, the strong arm of the court of chancery ought not to be interposed in that direction, except where resort to that court is grounded upon the settled principles which govern its jurisdiction;" and that the jurisdiction exercised by the courts of the United States to restrain by injunction the collection of a tax wholly illegal and void had always been rested on other grounds than merely the unconstitutionality of the tax. 139 U. S. 596–598.

In the light of these decisions, we proceed to an examination of the provisions of the Code of West Virginia of 1891, c. 29, § 67, under which the tax upon the plaintiff's bridge was assessed.

That section requires every corporation, owning or operating a railroad wholly or partly within the State, to make, through its principal officers, to the auditor of ·the State, on or before the 1st of April in each year, a return in writing, under oath, showing, among other things, the following: 1st. The whole number of its miles of railroad within the State. 2d. If the railroad is partly within and partly without the State, the whole number of miles within, and of those without the State, including all its branches. 3d. "Its railroad track in each county in this State through which it runs, giving the whole number of miles of road in the county, including the

track and its branches, and side and second tracks, switches and turnouts therein; and the fair cash value per mile of such railroad in each county, including in such valuation such main track, branches, side and second tracks, switches and turnouts." 4th. All its rolling stock, and the fair cash value thereof, distinguishing between what is used wholly within the State, and what is used partly within and partly without the State, and the proportionate value of the latter, according to the time used and the number of miles run thereby in and out of the State; "and the proportional cash value thereof to each county in this State through which such railroad runs." 5th. "Its depots, station houses, freight houses, machine and repair shops and machinery therein, and all other buildings, structures and appendages connected thereto or used therewith, together with all other real estate, other than its railroad track, owned or used by it in connection with its railroad, and not otherwise taxed, including telegraph lines owned or used by it; and the fair cash value of all buildings and structures, and all machinery and appendages, and of each parcel of such real estate, including such telegraph line, and the cash value thereof in each county in this State in which it is located."

The return made by the railroad company to the auditor is to be laid by him, as soon as practicable, before the board of public works. If the return is satisfactory to the board, the board shall approve it, and, by an order entered upon its records, direct the auditor to assess the property of the company with taxes, and he shall assess it as afterwards provided. But if the return is not satisfactory, the board is authorized to proceed, in such manner as it may deem best, to obtain the information required to be furnished by the return; and may compel the attendance of witnesses and the production of papers; and is directed, as soon as possible after having procured the necessary information, to assess and fix the fair cash value of all the property required to be returned, in each county through which the railroad runs; and, in ascertaining such value, to consider the return, and all the evidence and information that it has been able to procure, and all such as may be offered by the railroad company.

The legislature evidently intended that the annual return should include all the real estate owned or used by the railroad company in connection with its railroad within the State. The plaintiff's bridge across the Ohio River between the States of West Virginia and Ohio was real estate. It was a "building or structure," within the proper meaning of the words. *Bridge Proprietors* v. *Hoboken Co.*, 1 Wall. 116, 147; *Whitall* v. *Gloucester Freeholders*, 11 Vroom (40 N. J. Law), 302, 305. And it had been declared by Congress to be "a lawful structure." Act of July 14, 1862, c. 167; 12 Stat. 569. The fact that the bridge was an instrument of interstate commerce did not exempt so much of it as was within West Virginia from taxation by the State. *Henderson Bridge Co.* v. *Henderson*, 141 U. S. 679.

According to the facts alleged in the bill, and admitted by the demurrer, the plaintiff has been assessed by the board of public works one sum upon the whole length of its railroad track within the State, and another sum upon that part of the bridge within the State, as a separate structure.

The plaintiff alleged in the bill that its return included, in the number of miles of its main track, so much of the bridge as lay within the State; and contended that the bridge was included in "its railroad track," within the meaning of the third subdivision of the section of the code, above quoted, and therefore should have been assessed only as so many feet of the railroad. But the return does not mention the bridge; and, if it was included in the term "railroad track" in that subdivision, the increased value of the track by reason of the bridge might properly be taken into consideration in estimating the value of the railroad track, and the assessment of the track and the bridge separately would seem to be a difference of form rather than of substance. *Pittsburgh &c. Railway* v. *Backus*, 154 U. S. 421, 429; *Robertson* v. *Anderson*, 57 Iowa, 165.

If the bridge was not covered by the third subdivision, it was certainly included in the fifth. This subdivision begins by designating "depots, station houses, freight houses, machine and repair shops and machinery therein, and all other build-

ings, structures and appendages connected thereto or used therewith." It was argued that the words "thereto" and "therewith," in this sentence, referred to the same antecedent as the previous word "therein;" and that "therein" referred to depots, station houses, freight houses, machine and repair shops, and therefore "thereto" and "therewith" must be equally restricted. But if a strictly grammatical construction should be adopted, it may well be doubted whether "machinery therein" related to anything but machine and repair shops; and it can hardly have been the intention of the legislature to limit the words "buildings, structures and appendages connected thereto or used therewith" to those connected or used with such shops only. If the bridge is not a "building or structure," within the meaning of those words, as here used, it certainly (if not part of the "railroad track," under the third subdivision,) comes within the words next following, "together with all other real estate, other than its railroad track, owned or used by it in connection with its railroad." By a clause near the end of the same section, it is provided that "all buildings and real estate owned by such company, and used or occupied for any purpose not immediately connected with its railroad," are to be taxed like similar property of individuals.

The same section further provides that the decision made by the board of public works shall be final, unless the railroad company, within thirty days after such decision comes to its knowledge, appeals (which it is expressly authorized by the statute to do) from the decision, as to the assessment and valuation made in each county through which the railroad runs, to the circuit court of that county. The appeal is to have precedence over all other cases, and is to be tried as soon as possible after it is entered. That court, on such appeal, is to hear all legal evidence offered by the appellant, or by the State, county, district or municipal corporation, and, if satisfied that the valuation as fixed by the board of public works is correct, to confirm the same; but, if satisfied that such valuation is too high or too low, to correct it, and to ascertain and fix the true value of the property

according to the facts proved, and certify such value to the auditor.

This provision for a review and correction, by the circuit court of the county, of the assessment made by the board of public works affords a convenient and adequate remedy for any error in the taxation, and has been held by the highest court of the State to be in accordance with its constitution. *Wheeling Bridge Railway* v. *Paull,* 39 West Virginia, 142.

That court has often had occasion to inquire how far the action of the circuit court of the county, in this respect, is administrative only, and how far it may be considered as judicial in its nature. *Pittsburgh &c. Railway* v. *Board of Public Works,* 28 West Virginia, 264; *Charleston & Southside Bridge Co.* v. *Kanawha County Court,* 41 West Virginia, 658; *State* v. *South Penn Co.,* 42 West Virginia, 80. See also *Upshur County* v. *Rich,* 135 U. S. 467.

But it is not important, in this case, to pursue that course of inquiry; since, in matters of taxation, it is sufficient that the party assessed should have an opportunity to be heard, either before a judicial tribunal, or before a board of assessment, at some stage of the proceedings. *Kelly* v. *Pittsburgh,* 104 U. S. 78; *Pittsburgh &c. Railway* v. *Backus,* 154 U. S. 421.

Even if, therefore, no previous notice of the hearing before the board of public works was required by the statute, or was in fact given to this plaintiff, (which is by no means clear,) yet the notice of its decision, with the right to appeal therefrom to the circuit court of the county, and there to be heard and to offer evidence, before the valuation of its property for taxation was finally fixed, afforded the plaintiff all the notice to which it was entitled.

The railroad bridge in question being liable to assessment under section 67, it is unnecessary, for the purposes of this case, to determine whether it should be treated as "railroad track," or as a "building or structure," or as "other real estate, owned or used in connection with the railroad." In any view, its assessment and valuation by the board of public works, of which the plaintiff complains, was subject to review by the

circuit court of the county upon an appeal seasonably taken by the railroad company.

The section, indeed, also provides that, when the return made to the auditor is satisfactory to the board of public works, or when an assessment is made by that board, the auditor shall immediately certify, to the county court of each county through which the railroad runs, the value of the property of the railroad company therein, as valued and assessed as aforesaid ; that that court shall apportion that value among the districts, school districts and municipal corporations through which the railroad runs ; and that the clerk of that court, within thirty days after it has laid the county and district levies, shall certify to the auditor the apportionment so made ; that the recording officer of each district or municipal corporation through which the road runs shall, within thirty days after a levy is laid therein, certify to the auditor the amount levied ; and that, if any such officer fails to do so, the auditor may obtain the rate of taxation from the land books in his office or from any other source.

But the provision directing the auditor to immediately certify the assessment made by the board of public works to the county court of each county must be construed as subordinate to and controlled by the next preceding provision giving the right of appeal from the board of public works to the circuit court of the county — as clearly appears from the next succeeding provision, by which it is after the value of the property of the railroad company has been "fixed by the board of public works, or by the circuit court on appeal as aforesaid," that the auditor is directed to assess and charge the property of the company "with the taxes properly chargeable thereon," in a book to be kept by him for that purpose.

The statute also contains a provision that "no injunction shall be awarded by any court or judge to restrain the collection of the taxes, or any part of them, so assessed, except upon the ground that the assessment thereof was in violation of the Constitution of the United States, or of this State, or that the same were fraudulently assessed, or that there was a mistake made by the auditor in the amount of taxes properly charge-

able on the property of said corporation or company; and in the latter case no such injunction shall be awarded unless application be first made to the auditor to correct the mistake claimed, and the auditor shall refuse to do so, which facts shall be stated in the bill." While this provision cannot, of course, bind the courts of the United States, it is nearly in accord with the rule governing the exercise of the jurisdiction in equity of those courts, as established by the decisions cited at the beginning of this opinion.

The statute further makes it the duty of the auditor, "as soon as possible after he completes the said assessments," to make out and transmit to the railroad company "a statement of all taxes and levies so charged;" and the duty of the railroad company "so assessed and charged" to pay "the whole amount of such taxes and levies upon its property" by the 20th of January "next after the assessment thereof;" and if the company does not pay "such taxes and levies" by that day, the auditor is directed to add ten per cent to the amount thereof to pay the expenses of collecting them, and to certify to the sheriff of each county "the amount of such taxes and levies assessed within his county."

In the present case, the bill does not allege that there was any fraud in the assessment; or that the defendants made any attempt to interfere with the plaintiff's ownership or control of its real estate; or that the plaintiff either made any application to the auditor to correct any supposed mistake in the assessment, or took any appeal from the decision of the board of public works to the circuit court of the county; or that, within the thirty days allowed for such an appeal, any attempt was made by the defendants, either to charge the plaintiff with the penalty of ten per cent for delay in payment of the taxes, or to levy upon its property for non-payment of them.

On the contrary, the bill would appear to have been studiously framed to avoid making any such allegation. The bill, which was sworn to on March 18, 1895, alleged that on January 19, 1895, (sixty days before,) the plaintiff received notice from the auditor of the decision of the board of public works; that "on the —— day of 1895" (which might be any day

before the bill was sworn to) the auditor added the ten per cent and certified to the sheriff the amount of the tax assessed with that addition; and that the sheriff "since said date" had demanded payment of both sums from the plaintiff; and the affidavit filed with the bill on March 25, 1895, shows that the sheriff's levy on one of the plaintiff's engines was made after the bill was sworn to.

The only reasonable inference from these vague allegations of the bill is that the auditor waited for more than thirty days, after giving the plaintiff notice of the decision of the board of public works, in order to afford full opportunity for an appeal from that decision; and that no penalty was imposed for delay in payment of the taxes, nor any active measure taken to enforce them, until it had become clear that the plaintiff did not intend to take such an appeal.

The plaintiff, upon its own showing, having made no attempt to avail itself of the adequate remedies provided by the statute of the State for the review of the assessment complained of, is not entitled to maintain this bill.

*Decree affirmed.*