**ELGIN et al. v. HESSEN, City Treasurer,
and five other cases.**

(District Court, W. D. Tennessee, W. D. February 23, 1921.)

Nos. 758–763.

1. **Taxation ⊕⟞608(5)—Equity has jurisdiction to grant relief against excessive assessment.**

Where property is assessed as an entirety, and there has been an overvaluation arising from the adoption of a rule in conflict with constitutional or statutory direction, there is no remedy at common law by paying the tax and suing for recovery of the excessive portion, and equity has jurisdiction to restrain collection of such excess.

2. **Taxation ⊕⟞608(5)—Grounds of injunction to restrain collection of tax as excessive.**

To entitle a property owner to an injunction to restrain collection of taxes on the ground of excessive or discriminatory assessment, where complainant's property was assessed at actual value as required by statute, it must be shown, not only that other property generally was assessed at a lower valuation, but that such undervaluation was intentional and systematic.

3. **Municipal corporations ⊕⟞979—Preliminary injunction granted to restrain collection of excessive taxes by city.**

Temporary injunctions granted, restraining collection of a portion of the taxes levied by a city on public utilities, based on an assessment by a

state board at full market value, where other property in the city, assessed by a different tribunal, was intentionally and systematically given a valuation which did not in fact exceed 75 per cent. of its cash value.

In Equity. Suits by F. S. Elgin and J. F. Ramier, receivers of the Memphis Gas & Electric Company, by T. H. Tutwiler and F. S. Elgin, receivers of the Memphis Street Railway Company, by the Rock Island Memphis Terminal Railway Company, by the Choctaw, Oklahoma & Gulf Railroad Company, by the Memphis Union Station Company, and by the Arkansas & Memphis Railway Bridge & Terminal Company, against J. H. Hessen, Treasurer of the City of Memphis. On motions to set aside temporary restraining orders. Orders modified and continued.

Wright, Miles, Waring & Walker, of Memphis, Tenn., for complainants in first four cases.

J. W. Canada, of Memphis, Tenn., for complainants in other cases.

W. P. Armstrong, of Memphis, Tenn., for defendant.

PECK, District Judge (sitting by designation). On motions to set aside temporary restraining orders. The complainants in the several cases, all of which present the same question, are the receivers of the Memphis Street Railway Company, the receivers of the Memphis Gas & Electric Company, the Memphis Union Station Company, the Arkansas & Memphis Railway Bridge & Terminal Company, the Rock Island Memphis Terminal Railway Company, and the Choctaw, Oklahoma & Gulf Railroad Company. For the purposes of taxation they are all of the same class—public utilities within the city of Memphis. Their complaint is that the value of all other properties in the city has been uniformly and purposely assessed for taxation at 66 per cent. of its value, but that their property has been assessed at its full value, and that, unless they are relieved by injunction, they will be compelled to pay taxes upon that basis.

By the Constitution of Tennessee it is provided that—

"All property shall be taxed according to its value, that value to be ascertained in such manner as the Legislature shall direct, so that taxes shall be equal and uniform throughout the state. No one species of property from which a tax may be collected, shall be taxed higher than any other species of property of the same value." Article 2, § 28.

By the General Assessment Act of 1907 (Acts 1907, c. 602) the Legislature has enacted that—

"All property of every kind shall be assessed at its actual cash value. The term 'actual cash value,' whenever used in this act, is hereby defined to mean the amount of money the property would sell for if sold at a fair voluntary sale." Section 4.

Valuations are made for the state and county purposes, in the first instance, by the county assessor. His work is reviewed by the county board of equalization, and its results are gone over in turn by the state board of equalization, which finally fixes and determines the assessment. For the purposes of municipal taxation the initial valuation is made by the city assessor. His assessment is reviewed and the value is finally fixed by the board of equalizers of the city, with this exception

(which causes the present controversy): That the aforesaid state board assesses the valuations of the properties of·the public utility corporations within the city for the purposes of city, as well as all county and state taxation.

This system results in two complete parallel valuations of all city property, except that of the utilities, so that the lands of the citizens generally bear one valuation for state and county purposes and another for city purposes. Both assessments are made as of the 10th day of January.

For the year 1920 the city board fixed the total value of the real estate, exclusive of the utilities, within the city at $140,000,000. The state board assessed the same property at $212,000,000. The former assessment is 65.91 per cent. of the latter. The public utilities were assessed by the state at their full values.

[1] The defendant raises the objection that there is no equity jurisdiction of these causes. In support of this objection it is insisted that the complainants have a complete and adequate remedy at law by paying the tax and suing the city to recover it; that equity cannot be resorted to for the removing of the cloud of the tax liens from complainants' titles, because such payment, in pursuance of the legal remedy, will effectually remove it; and that complainants, respectively, will not be put to a multiplicity of suits because a single action against the city woud suffice for each.

It is admitted that there is no statute of Tennessee affording a remedy at law, and that section 1059 of Shannon's Code does not apply. But reliance is placed by the defendant upon the claim that the common law, as interpreted by the Supreme Court of the state, permits the maintenance of an action to recover taxes paid under protest that have been assessed under the circumstances alleged in these bills.

The general rule is that to be so recovered the tax must have been illegal and void, not merely irregular. Cooley on Taxation (3d Ed.) pp. 1487–1494. Balfour v. City of Portland (C. C.) 28 Fed. 738, is directly in point. The plaintiffs, British subjects, brought suit at law, alleging that in the assessment of their properties the defendant systematically and deliberately valued them doubly as high as other lands. The court says:

"I find no authority for paying the tax as a whole, and then suing at law to recover back the alleged excess. The tax does not consist of distinct items, levied under different laws, for distinct purposes, one of which may be legal and the other illegal. It was levied and collected as a whole, and as such is not illegal. The property was subject to taxation by the authority and for the purpose alleged. True, the result reached was erroneous, because of the willful disregard in the proceeding of the law requiring uniformity in the valuation of property for taxation within the jurisdiction of the defendant. Still, the proceeding being quasi judicial, and the subject-matter within the jurisdiction of the officers who conducted it, the result reached is so far conclusive that the legality of it cannot be questioned in an action at law to recover back the one-half of the tax as illegal."

The foregoing was approved as a correct statement of the law by the Supreme Court in Western Union Telegraph Co. v. Gottlieb, 190 U. S. 412, 23 Sup. Ct. 730, 47 L. Ed. 1116, and cited in Stanley v. Supervisors of Albany, 121 U. S. 535, 7 Sup. Ct. 1234, 30 L. Ed. 1000, in

which, in the opinion of the court by Mr. Justice Field, it was said (121 U. S. 549, 7 Sup. Ct. 1239, 30 L. Ed. 1000):

"It is only where the assessment is wholly void, or void with respect to separable portions of the property, the amount collected on which is ascertainable, or where the assessment has been set aside as invalid, that an action at law will lie for the taxes paid, or for a portion thereof."

It is there shown that the action of boards of revision, in passing judgment on the value of the property, is judicial, and that their judgments within their jurisdiction are not open to collateral attack. It is further stated (121 U. S. 550, 7 Sup. Ct. 1239, 30 L. Ed. 1000) that—

"When the overvaluation of property has arisen from the adoption of a rule of appraisement which conflicts with a constitutional or statutory direction, and operates unequally, not merely on a single individual, but on a large class of individuals or corporations, a party aggrieved may resort to a court of equity to restrain the exaction of the excess, upon payment or tender of what is admitted to be due."

In Western Union Telegraph Co. v. Gottlieb, supra, the converse of the proposition was determined, viz. that such an assessment is not void and cannot be resisted in an action at law, nor can overvaluation be made a ground of defense at law. In passing upon the case the Supreme Court of Missouri had distiguished between collateral attack upon the judgment of the board of equalization by raising the defense of discrimination in an action at law, and a direct attack thereon in equity to have the collection of the excess restrained. The Supreme Court concurred in this view, quoting from Balfour v. City of Portland, supra, and reaffirming the doctrine announced in Stanley v. Supervisors, supra.

There seems to be nothing to the contrary in the Tennessee cases which have been cited by the defendant for the purpose of showing that redress at law exists. In Bright v. Halloman, 7 Lea (75 Tenn.) 309, the tax itself, as distinguished from the assessment, exceeded the legal limit, and recovery of the unlawful excess was allowed; in Bank v. Memphis, 107 Tenn. 66, 64 S. W. 13, the tax itself was unlawful; and in Bank v. Memphis, 116 Tenn. 641, 94 S. W. 606, the assessment was void with respect to a separable portion of the property. On the contrary, the principle above set forth seems to be clearly recognized in Railroad v. Williams, 101 Tenn. 146, 148, 46 S. W. 448.

In the cases relied on by defendant to show the absence of equity jurisdiction, such jurisdiction was denied, either because the complainant had a definite statutory redress (Shelton v. Platt, 139 U. S. 591, 11 Sup. Ct. 646, 35 L. Ed. 273; Allen v. Pullman Palace Car Co., 139 U. S. 658, 11 Sup. Ct. 682, 35 L. Ed. 303; P., C., C. & St. L. R. R. v. Board of Public Works of West Virginia, 172 U. S. 32, 19 Sup. Ct. 90, 43 L. Ed. 354; Singer Sewing Machine Co. v. Benedict, 229 U. S. 481, 33 Sup. Ct. 942, 57 L. Ed. 1288; McLaughlin v. St. L. & S. W. R. R., 232 Fed. 579, 146 C. C. A. 537; Augusta v. Timmerman, 233 Fed. 216, 147 C. C. A. 222; Smith v. Douglas County, 242 Fed. 894, 155 C. C. A. 482), or the tax, being alleged to be illegal, and so void, the complainant was relegated to his action at law (Dows v. Chicago, 11 Wall. 108, 20 L. Ed. 65; Dalton Adding Machine Co. v. State Cor-

poration Commissioners, 236 U. S. 699, 35 Sup. Ct. 480, 59 L. Ed. 797). But in Union Pacific Railroad Co. v. Weld County, 247 U. S. 282, 38 Sup. Ct. 510, 62 L. Ed. 1110, where there was doubt as to the applicability of the state statute giving redress, equity jurisdiction was entertained. It is concluded that there is no adequate remedy at law, and that equity jurisdiction obtains.

The affidavits of the complainants go to show that the state board, which was created in 1919, in an effort to correct the evils of unequal standards of valuation, made an earnest attempt to assess the lands in the city of Memphis at their true values. This was done upon the oaths of witnesses from the various parts of the city and with the voluntary assistance of many citizens conversant with values. A preliminary valuation of $227,000,000 was thus reached. The county assessor, who was by law charged with the duty of making the initial assessment, valued the real estate in all at $201,000,000. The county board of equalization, next higher in rank, reduced the valuation to $196,000,-000. The state board then made its official equalization and put the final assessment at $212,000,000.

The city assessment of the same lands was made initially by the city assessor, concerning whose methods and work there is no evidence, except that he returned the property at $111,600,000, about one-half of the state board's original figure. This total was increased by the board of equalizers of the city to $140,000,000. The number of parcels appraised was about 35,000. The board of equalizers was in session for nine months, "not daily, but at frequent intervals." If this be construed to mean one-half that period, they had on the average the assessment of 250 parcels a day to revise, obviously a difficult task.

Complainants instance some 30 assessments of important business properties in the downtown district as typical. The state board's total of these is $4,690,000, as against 67½ per cent. thereof, or $3,166,000, as valued by the city board. While individually the percentages vary, the great majority of the city assessments of these 30 pieces are from 60 to 80 per cent. of those of the state. A number of large sales are especially instanced by the complainants. One well-known downtown corner, which sold for $200,000 at about the taxing day, was assessed by the city board at $130,000, or 65 per cent. On the other hand, the state board's assessment of some of these properties was too high.

The complainant submits a list of 1,100 sales of city real estate, made between July 1, 1919, and March 1, 1920, with the respective valuations of the parcels as fixed by the city board. As to 100 of these parcels, the state valuations are also shown. With regard to these 100, the city assessments are about 75 per cent. of the sums for which the parcels sold. The state assessments are slightly in excess of the sums realized. In 27 of the 100 instances the assessment of the state board exceeded the price. Out of the total of 1,100 sales, the city assessment fell substantially below the price in about 950 and approximately equaled or exceeded it in only 150 instances.

The city assessment appears to average about 75 per cent. of the price actually realized throughout the entire list of 1,100 sales. In individual instances there is a wide variation from that percentage. The

affiants attribute certain statements to the mayor of the city, to the effect that the assessment would be about 70 per cent. of the values. These statements the mayor emphatically denies. They are of the most doubtful materiality, in any event, as the mayor had nothing to do with the making of the assessment.

The receivers of the street railway system show that it was assessed at $10,449,887, its full value, being the same sum upon which its rate of fare was based by the Railroad and Public Utilities Commission of the state; that the system is operated upon the cost of service plan, and that during the last six months, such being the period of time which forms the basis of rate adjustment, the receivers operated at a loss of $110,000, and if compelled to pay the disputed tax, which amounts to $71,250, they will have to raise the rate of fare from 6 to 7 cents. The receivers of the gas and electric company show that it is insolvent; that in 1918 it was assessed at $4,394,000, and in 1920 at $9,104,-000, its full value. The properties of the other complainants are also assessed at their full values.

To meet the foregoing evidence, the defendant offers the affidavits of the five members of the board of equalizers of the city, to the effect that it was their earnest endeavor to revise all assessments at their "fair cash market value," and that in their judgment they have done so, and that the total of their assessment, $140,000,000, is the fair cash market value, so far as the same can be ascertained; that there was no intention to undervalue any property; that the state board's assessments are in many instances excessive. In the opinion of one of these affiants, the state board's total is excessive. Two citizens of high standing and large experience in the affairs of the community assisted the board voluntarily. They make affidavit that they know that the board did not intentionally value any property at less than its fair cash market value, and did, in their opinion, so value it. The certificate of the board of equalizers, transmitting the tax roll to the city treasurer, certifies that they had done so.

The chairman of the county board of equalization, which made the $196,000,000 assessment that was subsequently raised by the state board to $212,000,000, swears that in his judgment not only the latter, but also the former, figure is above the actual value of the property. Some 15 men engaged in the real estate business depose that some of the state board's assessments are excessive, and that the city board's valuation "is as near 100 per cent. value" as possible. One of them sets forth 30 instances of overvaluations by the state board. A large number of affidavits that had previously been filed in support of complaints of taxpayers against the assessments made by the state board are appended to the defendant's proof.

[2] To warrant the issuance of an injunction, complainants must show, not only that their own property was assessed at a higher rate, but that the city real estate generally was undervalued; that such undervaluation was intentional, and that it was systematic, or pursuant to some scheme or rule. Cummings v. National Bank, 101 U. S. 153, 25 L. Ed. 903; Maish v. Arizona, 164 U. S. 599, 17 Sup. Ct. 193, 41 L. Ed. 567; People v. Barker, 179 U. S. 279, 21 Sup. Ct. 121, 45 L. Ed. 190;

Coulter v. L. & N. R. R. Co., 196 U. S. 599, 25 Sup. Ct. 342, 49 L. Ed. 615; Greene v. Louisville & Interurban R. R. Co., 244 U. S. 499, 37 Sup. Ct. 673, 61 L. Ed. 1280; L. & N. R. R. Co. v. Greene, 244 U. S. 522, 37 Sup. Ct. 683, 61 L. Ed. 1291, Ann. Cas. 1917E, 97; Illinois Central R. R. v. Greene, 244 U. S. 555, 37 Sup. Ct. 697, 61 L. Ed. 1309. In Sunday Lake Iron Co. v. Township of Wakefield, 247 U. S. 350, 38 Sup. Ct. 495, 62 L. Ed. 1154, the opinion of the court, by Mr. Justice McReynolds, states the rule to be that—

"Intentional systematic undervaluation by state officials of other taxable property in the same class contravenes the constitutional right of one taxed upon the full value of his property."

[3] It is not necessary to determine now whether the proofs submitted would be sufficient to warrant a permanent injunction. All that is now necessary is for the complainants to make out a probable case of right to equitable relief, and it then becomes a matter of discretion whether a temporary injunction shall be granted. The proofs submitted show that the complainants' properties have been assessed at their full values, and the preponderance of the evidence does show, with sufficient clearness for the present purpose, at least, that the city property generally was valued at considerably less than its actual selling value on tax-fixing day, as indicated by the contemporaneous sales, and probably at not more than 75 per cent. of its actual market value. On the other hand, there is little to show that the city appraisement fell as low as 66 per cent. of the true values, except some instances of sales selected by complainants, which are insufficient, and the fact that the city valuation bore that percentage to the valuation made by the state board. But it cannot be assumed, and it is not shown with any degree of certainty, that the state board was entirely accurate. The evidence does indicate that in many instances the state board has appraised property in excess of its market value; and while the proofs upon that subject are not at all clear, it is not unlikely that the total of the state board's assessment may be somewhat in excess of the total value of the city property.

That there is a disparity between the standards of assessment used by the two boards seems to be fairly demonstrated by the fact that one is with substantial uniformity higher than the other. The state board has apparently made what may be termed a radical and uncompromising 100 per cent. valuation. The work of the city board was described by one of its members in his affidavit to be that "all equalizations of taxes were made on a 100 per cent. basis of a fair and conservative tax value," and while he says the property was not assessed at over or under its cash market value, he adds that the total assessment "represents a conservative cash value of the real estate of the city of Memphis." The one board hewed to the line and oftentimes over it, regardless of where the chips might fall; the other pursued a course of conservatism that led to assessing the properties at about 75 per cent. of what they were actually selling for in the open market. While an argument might perhaps be made for each method, certainly little can be said in favor of applying one to part, and the other to the rest, of the taxpayers. The diverse policies of the two boards are so marked

in their results as to constitute, in effect, different rules or systems of valuation.

The city board must have pursued its policy intentionally. On no other theory can be satisfactorily explained the fact that its figures are almost invariably lower than those of the state board and with substantial uniformity below the level of contemporaneous sales, and that well-known properties in the central district, transferred during the progress of the assessment, were put by it at substantially below their sale prices. It is therefore concluded that it has been shown sufficiently for the purposes of temporary injunction that the course pursued by the city board, while not perhaps intended to result in discrimination against the utilities, was nevertheless an undervaluation, and that, while its aim may have been mere conservatism, its policy was intentional and systematic, and did result in an assessment at 75 per cent. or less of the values of the city property, on the average.

The temporary restraining order heretofore allowed will be modified, so as to restrain defendant from collecting a tax in excess of 75 per cent. upon the assessment made by the state board of equalization of complainants' respective properties, upon payment by complainants of so much, in addition to the amount heretofore paid, as will equal the aforesaid 75 per cent.

In this case the additional question, viz. whether the complainant is properly taxed upon one-half of the length of its bridge across the Mississippi river, despite its contention that only 34 per cent. thereof is within the state of Tennessee, has not been argued or considered, but has been reserved for the future consideration of the court. The temporary injunction heretofore allowed will stand in respect to this issue, with leave to the defendant to call the matter up by a motion at any time prior to the final hearing in the case.