747 F.2d 721
 241 U.S.App.D.C. 284
 UTAH POWER & LIGHT COMPANY, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Denver and Rio Grande Western Railroad Company, et al., Utah
Division of Public Utilities, Intervenors.
 No. 83-1276.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 15, 1983.
Decided Oct. 30, Nov 13 and 20 and Dec. 18, 1984.
 
 Petition for Review of an Order of the Interstate Commerce commission.
 Michael F. McBride, Washington, D.C., with whom Mindy A. Buren, Washington, D.C., was on the brief, for petitioner.
 H. Glenn Scammel, Atty., I.C.C., Washington, D.C., with whom John Broadley, Gen. Counsel, and Ellen D. Hanson, Associate Gen. Counsel, John J. Powers, III, and John P. Fonte, Attys., U.S. Dept. of Justice, Washington, D.C., were on the brief, for respondents. Lawrence H. Richmond, Atty., I.C.C., Washington, D.C., also entered an appearance for respondent I.C.C.
 Richard J. Metzger, Chicago, Ill., with whom Kendell T. Sanford, Denver, Colo., R. Eden Martin and Lawrence A. Miller, Washington, D.C., were on the brief, for intervenors Denver & Rio Grande Western R. Co., et al. David M. Levy, Washington, D.C., also entered an appearance for Denver & Rio Grande Western R. Co., et al.
 Before WILKEY and GINSBURG, Circuit Judges, and MacKINNON, Senior Circuit Judge.
 Opinion for the Court filed by Senior Circuit Judge MacKINNON.
 Concurring Opinion filed by Circuit Judge GINSBURG.
 MacKINNON, Senior Circuit Judge:
 
 
 1
 The Utah Power and Light Company ("Utah Power" or the "Utility") petitions for review of a decision of the Interstate Commerce Commission ("ICC"). That decision reversed an earlier decision of the Utah Public Service Commission ("Utah Commission") ordering the Denver and Rio Grande Western Railway Company (the "Rio Grande") and the Salt Lake, Garfield and Western Railway Company (the "Salt Lake") to reduce the tariff on certain intrastate coal movements and to pay reparations for the period from March 28, 1981, onwards. Without applying to the Utah Commission for rehearing, the railroads petitioned the ICC for review of the order "on the grounds that the standards and procedures applied by the State Commission were not in accordance with the provisions of ..." the federal statute. Staggers Rail Act of 1980 Sec. 214(c), 94 Stat. 1895, 1914-15 (1980) (codified at 49 U.S.C. Sec. 11501(c) (Supp. V 1981)). The Rio Grande and Salt Lake have intervened in support of the ICC, the Utah Commission in support of Utah Power. We hold that the ICC had jurisdiction to review the Utah decision, and uphold the ICC's reversal of the Utah Commission, but we remand to the ICC to supplement the record on certain cost figures relevant to determining the appropriate rate.
 
 I. BACKGROUND
 
 2
 The rate at issue in this dispute is that to be charged for the volume movement of bituminous coal by unit train from Valley Camp Mine at Clear Creek, Utah, to Utah Power's Gadsby Plant at Salt Lake City, Utah. The Rio Grande handles the coal for all of the 118 mile, round trip journey, except for the last half-mile which traverses the tracks of the Salt Lake.[1] The Union Pacific Railroad (UP) provides switching services necessary to connect the other two railroads. The entire movement is intrastate.
 
 
 3
 On March 27, 1981, relying on section 229 of the Staggers Rail Act of 1980,[2] Utah Power filed separate complaints with the Utah Commission and the ICC. Utah Power alleged that the railroads carrying this coal traffic had market dominance over the transportation of coal from Valcam, Utah to Gadsby, Utah,[3] and that the existing applicable rate of $5.97 per ton (Rio Grande Tariff No. 4166) was unreasonably high. Ruling that the Utah Commission had initial jurisdiction over the intrastate rate, the ICC dismissed the complaint filed with it.
 
 
 4
 Utah Power pursued its complaint before the Utah Commission, which conducted a full inquiry regarding the rate. The Utah Commission had previously represented to the ICC that it would follow federal standards and procedures in accordance with the Staggers Act, and on this representation the Utah standards and procedures had been provisionally certified by the ICC as acceptable state procedures.[4] On December 21, 1982, the Utah Commission issued its Report and Order ruling that the railroads had market dominance over the transportation to which the rates at issue applied, that the Rio Grande was revenue adequate, and that subject rates were unreasonably high. In the Matter of UTAH POWER & LIGHT CO. versus The Denver & Rio Grande Western Railroad Co., Union Pacific Railroad Co., and Salt Lake, Garfield and Western Railway Co., No. 83-035-06, Report and Order (Public Service Commission of Utah, Dec. 21, 1982) (hereinafter "Utah Commission Report and Order") (Joint Appendix ("JA") 86). The Utah Commission ordered the railroads to reduce the rates and to pay reparations to Utah Power. The decision was to take effect thirty days from the date of service of the decision unless a prior stay was granted. At no time did any party file an application for rehearing with the Utah Commission.
 
 
 5
 On January 14, 1983, the railroads requested the Utah Commission to stay the Order until March 2, 1983. Utah Power opposed the request on the ground that no party had applied for rehearing of the Commission's decision. On January 19, 1983, the Utah Commission granted the railroad's requested extension without comment on the rehearing issue.
 
 
 6
 On January 19, 1983, the Rio Grande and the Salt Lake petitioned the ICC for review of the Utah Commission's decision pursuant to Sec. 214(c) of the Staggers Act, which provides:
 
 
 7
 Any rail carrier providing transportation subject to the jurisdiction of the Commission under subchapter I[5] of chapter 105 of this title may petition the Commission to review the decision of any State authority, in any administrative proceeding in which the lawfulness of an intrastate rate, classification, rule, or practice is determined, on the grounds that the standards and procedures applied by the State were not in accordance with the provisions of this subtitle. The Commission shall take final action on any such petition within 30 days after the date it is received. If the Commission determines that the standards and procedures were not in accordance with the provisions of this subtitle, its order shall determine and authorize the carrier to establish the appropriate rate, classification, rule, or practice.
 
 
 8
 Staggers Rail Act of 1980 Sec. 214(c), 94 Stat. 1895, 1914-15 (1980) (codified at 49 U.S.C. Sec. 11501(c) (Supp. V 1981) (hereinafter section 11501(c)). The Utah Commission moved the ICC to dismiss the petition, arguing that because the Rio Grande and Salt Lake had failed to exhaust their state administrative remedies by petitioning for rehearing before the Utah Commission, the ICC was without jurisdiction to review the decision of the Utah Commission.
 
 
 9
 After the initial filing of the railroad's petition, the ICC requested the Rio Grande and Salt Lake to provide a missing page of an appendix to its petition. After the page was filed, the ICC notified counsel for the railroads that its filing was deemed complete as of January 28, 1983 and that the ICC, being required to take final action within 30 days, would act on the petition by February 25, 1983.
 
 
 10
 In a decision dated February 25, 1983, but not served until March 2, 1983, the ICC affirmed the Utah Commission's holding of market dominance, reversed its decision on the revenue adequacy of the Rio Grande, and the unreasonableness of the rate, and held that the rates in issue were reasonable. Petition of the Denver & Rio Grande Western Railroad Co. and Salt Lake, Garfield and Western Railway Co. for Review of a Decision of the Public Service Commission of Utah Pursuant to 49 U.S.C. 11501, No. 39060 (I.C.C. Feb. 25, 1983) (hereinafter "ICC Decision") (J.A. 584). On March 8, 1983, the ICC served the cost appendix to its March 2, 1983 decision (JA 596). In that appendix, the ICC explained its earlier decision to reverse some of the cost findings of the Utah Commission on disputed issues, and to affirm others.
 
 
 11
 Utah Power then petitioned this court for review of the ICC's decision on a number of grounds. Petitioner now argues, inter alia, that the ICC exercised jurisdiction unlawfully because the railroads had failed to exhaust their state administrative remedies; that the ICC violated its statutory mandate and lost jurisdiction when it allegedly failed to serve its decision within 30 days; that the ICC exceeded its appellate jurisdiction by unlawfully conducting a de novo review of the record compiled before the Utah Commission; and that the ICC's cost calculations were not supported by substantial evidence and constitute an abuse of discretion. We agree only that some of the cost calculations are questionable, and thus remand the case to the ICC for a fairly limited re-examination of its determination as to the reasonableness of the railroads' existing rate. Otherwise we affirm the decision of the ICC. In particular, we hold that the Utah Commission's decision was properly overturned for its failure to follow federal standards on revenue adequacy.
 
 II. THRESHOLD JURISDICTIONAL ISSUES
 
 12
 A. The Exhaustion of Administrative Remedies
 
 
 13
 One "long-settled rule of judicial administration [is] that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50-51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938) (citing cases) (emphasis added); see Porter v. Investors Syndicate, 286 U.S. 461, 471, 52 S.Ct. 617, 620, 76 L.Ed. 1226 (1932). Utah Power here seeks to invoke this rule and thus to deny jurisdictional legitimacy to the railroads' resort to the ICC. The ICC maintains that it had an adequate jurisdictional foundation for its review of the Utah decision.
 
 1. The Staggers Act Certification Process
 
 14
 On the exhaustion issue, we have great difficulty with the ICC's sweeping assertion in this case that federal preemption completely forecloses any necessity of the ICC giving consideration to a state rehearing requirement. We do not conclude that federal preemption in the Staggers Act can be extended to such limits. Rehearing is a normal feature of administrative action and when properly applied for, and responded to, can work to substantially reduce subsequent litigation. We do not interpret the Staggers Act as ruling out all necessity to apply for rehearing in state cases. In the course of enacting the Staggers Act, Congress expressly rejected a sweeping federal preemption of the state regulatory role. Such preemption was originally provided for in the bill that became the Staggers Act,[6] but the attempt to oust the states completely from some regulatory role in intrastate rates was defeated. Instead, a compromise resulted which guaranteed that "[i]ntrastate rail movements [in most cases] will continue to be regulated by state regulatory agencies with uniformity and consistency." 126 Cong.Rec. H8548 (daily ed. Sept. 9, 1980) (statement by Rep. Staggers). Rehearing is a normal, though not universal, feature of such state regulation. The legislative compromise was recorded in the Conference Report: "states may only regulate in these areas if they are certified under the procedures of [section 11501]." H.Rep. No. 96-1430, 96th Cong., 2d Sess. 106 (conference), reprinted in 1980 U.S.Code Cong. & Ad.News 3978, 4110, 4138. Thus, the states' authority to regulate depends upon ICC certification of their regulatory procedures--which might include rehearing procedures--in order to ensure that federal standards established by and in accordance with the Staggers Act will be applied uniformly in determining intrastate rates.
 
 
 15
 We also reject the attempt by the ICC to find some support for its assumption of jurisdiction purely on the fact that "Utah's intrastate rate regulation has been only provisionally certified." ICC Brief at 27 (emphasis in the original). This contention simply does not wash. In so contending the ICC attempts to inflate the scope of its own discretionary authority to a degree wholly unsupported by the Staggers Act. First of all, the Act does not provide explicit authority for a provisional certification. The purpose of the ICC in "provisionally" certifying was to act timely in order to bring complying states immediately under federal jurisdiction on intrastate rates, in the meantime depriving the state agencies of some of the benefits of a final certification by leaving open the capability of the ICC subsequently to reject certification if it should finally determine that the State Commission's standards and procedures were deficient. In the interim, though, the State Commission's standards and procedures must be considered to have been "certified." A provisional certification is still a certification. It is not a partial certification. We find the conditional certification of the Utah standards and procedures to be valid. See Illinois Central Gulf Railroad Co. v. ICC, 720 F.2d 958, 962 (7th Cir.1983). The ICC in so acting was filling a void in the Staggers Act which permitted the agencies involved to carry out its basic intent and purpose that intrastate rail operations would conform to federal standards and procedures. Id.
 
 
 16
 Finally, we must reject the ICC's view of the certification process. The ICC appears to assert that even if it had certified an express rehearing petition requirement, it could nevertheless ignore a party's failure to comply with such a requirement, as any other course "would render review of certified states' procedures in individual appeals impossible." ICC Brief at 27-28. We disagree that ICC review under such circumstances would become impossible. Because we hold, infra, that in the circumstances of this case the ICC was justified in exercising jurisdiction under section 11501(c), it is not necessary to address further the ICC's contention that it could ignore such a rehearing requirement if it were clearly stated and subsequently certified.
 
 
 17
 2. The Exhaustion Requirement in the Staggers Act Setting
 
 
 18
 In many cases administrative remedies must be exhausted if litigants are to gain judicial review in federal courts, although that is not a hard and fast rule, even for review by courts. In any event, however, and contrary to the contentions of Utah Power, exhaustion by rehearing is not required in this case. We find several reasons for concluding that the railroads were not compelled to exhaust the state agency rehearing option prior to seeking ICC review.
 
 
 19
 First, to the extent that local law controls the issue, the Utah statute does not impose any firm exhaustion requirement. The applicable Utah statute, Utah Code Ann. Sec. 54-7-15 (1953) as amended,[7] and Rule 19[8] of the Utah Commission indicate that those rehearing provisions are only a prerequisite for further court action.
 
 
 20
 First, the topical heading of the statute so states:
 
 Utah Code Ann. Sec. 54-7-15:
 
 21
 Review or rehearing by commission--Application--Procedure--Prerequisite to court action.[9]
 
 
 22
 1981 Utah Laws 1126, 1132, ch. 215, Sec. 5. The topical heading "[p]rerequisite to court action " (emphasis added) indicates the intent of the legislature, because the heading was part of the Act as enacted by the Utah Legislature and was not inserted by the revisor, codifier, or publisher. See id. Consistently, the body of the Utah statute also refers to court action. See supra, n. 7. A "legal action" most frequently refers to a suit in court. At best "legal action" is ambiguous; interpreting it in line with the topical heading and the express reference to proceedings "in any court," we conclude that the Utah Act relates the rehearing only to subsequent "court action[s]." Quite obviously, an ICC proceeding is not a "court action." Also, the Utah statute is permissive rather than mandatory, providing that a party affected by an order of the Commission "may apply [to the Utah Commission] for review or rehearing." In addition, failure timely to apply for rehearing does not, under decisional Utah law, preclude a subsequent administrative proceeding that makes a substantive attack on a Commission decision. Bowen Trucking, Inc. v. Public Service Commission, 559 P.2d 954, 956 (Utah 1977) (citing Sale v. Railroad Commission, 15 Cal.2d 612, 104 P.2d 38, 40-41 (1940)). The terms of the Utah statute thus do not require an application for rehearing as an absolute precondition even to state administrative proceedings.
 
 
 23
 Nor does Rule 19[10] of the Rules of Practice of the Utah Commission create the asserted exhaustion requirement. The relevant subsections of the Rule only provide time limits for filing rehearing petitions with the Utah Commission and petitions for writs of certiorari to the Utah Supreme Court. Such petitions control access to the Utah Supreme Court, not the ICC. In addition, consistent with the Utah statute, the Utah Commission's topical heading to subsection (f) of the Rule is entitled "Judicial Review." In sum, neither the Utah Legislature in the Act, nor the Utah Commission in its regulations, ever intended to prescribe the jurisdiction of the ICC.
 
 
 24
 Furthermore, it is important to recognize that Utah has only such limited authority to limit the jurisdiction of the federal Commission as the Staggers Act may attach to its statutory and regulatory procedures. While in some instances the Utah statutes and agency rules might be construed under federal law to lead to circumstances in which the ICC might refuse to take jurisdiction, that jurisdiction in the last analysis is dependent on federal statutes, regulations and decisional law. Under federal law and the ICC's practice, petitioners to the ICC from decisions of state agencies are not necessarily required to exhaust state administrative remedies.
 
 
 25
 On the applicability of exhaustion here, Utah Power is confused. When a party in federal court seeks judicial review of the decision of an administrative agency it is well established, subject to some exceptions, that the party must generally exhaust any administrative remedy available to it. See, e.g., Myers v. Bethlehem Corp., 303 U.S. 41, 50-52, 58 S.Ct. 459, 463-465, 82 L.Ed. 638 (1938) (citing cases). This rule has been applied to attempts to invoke the powers of the courts against state administrative agencies from early on. See Pittsburgh, Cincinnati, Chicago & St. Louis Railway Co. v. Board of Public Works, 172 U.S. 32, 38, 19 S.Ct. 90, 92, 43 L.Ed. 354 (1898). The requirement originated out of considerations of equity jurisdiction, in which the party seeking an injunction against the decision of a state agency without availing himself of an opportunity to apply for rehearing was deemed to have an adequate remedy at law: "No court of equity will ... allow its injunction to issue [unless the petitioner] has no adequate remedy by the ordinary processes of the law." Id.
 
 
 26
 In contradistinction, though, when an affected party attempts to invoke the jurisdiction of a federal administrative agency to review a decision of a state administrative agency the same limitations stemming from the limits on a court's equity jurisdiction or authority are not applicable in the absence of statute, regulation, or decisional law. In such cases, the jurisdiction of the federal agency, and thus the application of the exhaustion doctrine, turn on the particular statute and its legislative history. In cases where the statute, or regulations thereunder, do not require exhaustion, courts may look to the statutory role of the state agency and tailor the exhaustion rule to fit the role assigned to that state agency. See Patsy v. Board of Regents, 457 U.S. 496, 502 n. 4, 102 S.Ct. 2557, 2561 n. 4, 73 L.Ed.2d 172 (1982); State of Texas v. United States, 730 F.2d 409, 414 (5th Cir.1984) (ICC review under section 11501(c) of the Staggers Act not limited to final decisions of state agencies).
 
 
 27
 The applicable federal statute here provides that:
 
 
 28
 Any rail carrier ... may petition the [ICC] to review the decision of any State authority, in any administrative proceeding in which the lawfulness of an intrastate rate ... is determined, on the grounds that the standards and procedures applied by the State were not in accordance with the provisions of [the Staggers Act].
 
 
 29
 49 U.S.C. Sec. 11501(c) (emphasis added). The decision of the Utah Commission is a decision of a "state authority," and the Rio Grande seeks ICC review of that decision without having applied for rehearing. The federal statute does not specifically limit the jurisdiction of the ICC to final decisions of state agencies or require exhaustion of administrative remedies.[11] Exhausting available rehearing options would often be consistent with sound administration, would in many instances avoid unnecessary litigation, would allow deference to state administrative expertise, and would recognize administrative autonomy in proper cases. Nothing in the Staggers Act, however, specifically requires complete exhaustion of available state administrative rehearing remedies as a precondition to ICC review, and the ICC itself has imposed no such requirement. See State of Texas, supra, 730 F.2d at 409. In our view, any overly rigid exhaustion requirement would be sharply inconsistent with one of the central purposes of the Staggers Act--facilitating swift federal review of final decisions by state commissions.
 
 
 30
 While the ICC may in some cases apply reasonable exhaustion requirements, we cannot fault its decision to review this state administrative decision as presented. The extensive consideration of the issues by the Utah Commission, and the vigorous defense before this court by the Utah Commission of its very detailed decision, adopting all the arguments advanced by Utah Power,[12] indicate that any request for rehearing would be denied. This case thus comes within the well-recognized exception to the exhaustion requirement that does not require a party to engage in a futile proceeding. Where application for rehearing is a mere formality in an administrative proceeding, judicial relief may be sought without exhausting such procedure if the order challenged is definitive and deals with the merits in controversy. Levers v. Anderson, 326 U.S. 219, 66 S.Ct. 72, 90 L.Ed. 26 (1945); see Athlone Industries, Inc. v. Consumer Product Safety Commission, 707 F.2d 1485, 1488-89 (D.C.Cir.1983) (When the prior position of the agency indicates that an application for rehearing would be futile, it is not necessary to exhaust administrative remedies before seeking judicial relief); Etelson v. Office of Personnel Management, 684 F.2d 918, 923 (D.C.Cir.1982) (Two strong factors supporting a conclusion that a litigant need not exhaust administrative remedies are that a form of his claim was raised before the agency and that "the agency has demonstrated its disinclination to respond favorably to [the] claim."). Any administrative purposes favoring exhaustion generally were satisfied here when the Utah Commission considered the matter in extenso, made its ruling, stated the reasons for its decision, and adhered to them without deviation in this proceeding. As in State of Texas, supra, exhaustion here would have been futile and could have served "no useful purpose." 730 F.2d at 414. In conclusion, Utah Power will not be allowed to exalt what is at best an ambiguous rehearing requirement into an absolute bar to ICC jurisdiction in this case.[13]B. The ICC's Alleged Delay in Serving its Decision
 
 
 31
 The Staggers Act provides that when an appeal from a state agency decision is taken to the ICC, "[t]he Commission shall take final action on any such petition within 30 days after the date it is received." 49 U.S.C. Sec. 11501(c). Utah Power argues that because the date of service was not within 30 days of the filing of the completed petition, that deprived the ICC of the right to decide the merits of the petition. We disagree with the factual assumptions upon which Utah Power bases its contention, and necessarily therefore with its conclusion. In addition, we could not support such an extreme sanction.
 
 
 32
 In this case, the railroads filed an incomplete petition on January 19, 1983. According to the briefs, the incompleteness was corrected by the subsequent filing of one additional page by mail on January 28, 1983. The ICC's official record indicates it was filed by the railroads, by letter, on "2/2/83" (JA 03). Furthermore, the "Record before the Utah [Public Service Commission]" was not filed until "2/8/83" (JA 03). The ICC's decision is dated February 25, 1983, but it was not served until March 2, 1983 (JA 04). Upon these facts, we must concur with the ICC that time did not start to run against the ICC until the complete petition was filed, on January 28 at the earliest. It would be folly to start the running of the prescribed time for decision before a complete petition is filed.
 
 
 33
 As to when the period ended, Utah Power points to 49 U.S.C. Sec. 10327(i) of the Staggers Act, which provides that "an action of the Commission ... is final on the date on which it is served ...." In response, the ICC relies on Union Pacific Railroad v. United States, 637 F.2d 764 (10th Cir.1981). Faced with a closely analogous situation, the Tenth Circuit ruled that section 10327(i) relates to the time limit for "judicial review," not for the decision, and that the date "the decision was entered" by the Commission was the date to be considered for the purposes of the 30 day limitation set by section 11501(c). Id. at 767. Appellant urges that the Tenth Circuit case was wrong. Brief for Utah Power at 22. We disagree. We too interpret section 10327(i) only to provide the date when time will start running for the purpose of computing the time limits for rehearing and review. Accordingly, the ICC having rendered its decision on February 25, 1983 (JA 584), it ruled before expiration of the allotted statutory period.
 
 
 34
 Utah Power hypothesizes that if the court approves of this delay then the ICC could get away with delays of "50, 75, or 100 days ..." Brief for Utah Power at 23. Delay to that extent is not before us, and we are not disposed to render a curbstone opinion thereon. We rule only that, where the ICC renders a decision that is within the statutory period, the statute is satisfied, and subsequent minor delay in serving the decision does not negate the timeliness of the decision.[14]
 
 
 35
 III. THE ICC REVIEW OF THE UTAH COMMISSION PROCEEDINGS:
 
 STANDARDS OF REVIEW
 
 36
 A. The Standards for ICC Review of State Commission Decisions
 
 
 37
 In its central attack on the ICC decision, Utah Power argues that the ICC exceeded the scope of its authority in purportedly conducting a de novo review of the proceedings and decision of the Utah Commission. "[J]ust as a reviewing court whose function is similar to that of the ICC under Sec. 11501(c) in the sense that both bodies are charged with ensuring that an agency follows the governing statute," asserts Utah Power, "the ICC was not intended to act 'as though it were conducting a trial de novo.' New York v. United States, 331 U.S. 284, 335 [67 S.Ct. 1207, 1234, 91 L.Ed. 1492] (1947)." Utah Power Brief at 29. In support of its argument, Utah Power seizes on a reference to the ICC's role under section 11501(c) as "quasi-appellate," Illinois Central Gulf Railroad v. ICC, 702 F.2d 111, 114 (7th Cir.1983), and also relies upon the recent opinion of the Sixth Circuit in Kentucky Utilities Co. v. ICC, 721 F.2d 537 (6th Cir.1983). Finally, petitioner contends that because the statute requires completion of ICC review within 30 days, Congress in requiring such prompt decisions could not have intended the ICC to conduct a searching and thorough inquiry of state proceedings and decisions.
 
 
 38
 The statutory standard of review governing the ICC in this case is set forth in section 11501(c), supra. In authorizing the ICC to review the "lawfulness" of the rate, that provision establishes a broad basis for appeal because it permits petitioners to attack any "standard[ ] or procedure" applied by the state for noncompliance with the applicable provisions of the Staggers Act. In addition, as the ICC ably points out, Utah Power and the Utah Commission "ignore[ ] the statutory language" which requires that the ICC delve substantially further into the matter:
 
 
 39
 Section 11501(c) does more than direct the ICC to review state decisions to see that the "standards and procedures" applied are "in accordance with" the federal statute. If the ICC finds that the state applied incorrect "standards and procedures," it must also "determine ... the appropriate rate" (emphasis added). The ICC obviously could determine that the "appropriate" rate was neither that proposed by the railroad (if the rate were shown to be unreasonably high) nor that ordered by the state (if that did not represent the maximum reasonable rate by the Commission's standards). This is clearly a fact-based determination. Thus the ICC is not confined to the purely appellate role of reversing a lower tribunal's rate decision.
 
 
 40
 ICC Brief at 30-31.
 
 
 41
 The exact scope of the ICC's authority over the decisions of state commissions is not spelled out in the statute. The legislative history leaves little doubt, however, that the ICC was vested with powers to act as broadly as it would have enjoyed had it been the administrative agency of first instance. The Conference Report on the Staggers Act first refers to the House Amendment to section 11501, stating:
 
 
 42
 [I]t amends section 11501 by adding new provisions which provide that only State authorities whose standards and procedures have been certified by the Commission may exercise jurisdiction over intrastate rail rates, classifications, rules and practices. Intrastate rail transportation not subject to the jurisdiction of a certified State authority is subject to the jurisdiction of the Commission. In no event may a State authority exercise jurisdiction over general rate or inflation-based rate increases. Decisions of State authorities may be appealed to the Commission if not in accordance with this subtitle.
 
 
 43
 H.Rep. No. 96-1430, 96th Cong., 2d Sess. 106 (conference), reprinted in 1980 U.S.Code Cong. & Ad.News 4110, 4138. The Conference Committee adopted the House amendment in major part and to the congressional intent expressed in section 11501 added this further gloss:
 
 
 44
 The conference substitute adopts the House amendment, except that the Commission's power to adjust intrastate rates is retained in the event that actions by certified states impose a burden on interstate commerce. The conferees' intent is to ensure that the price and service flexibility and revenue adequacy goals of the Act are not undermined by state regulation of rates, practices, etc., which are not in accordance with these goals. Accordingly, the Act preempts state authority over rail rates, classifications, rules and practices. States may only regulate in these areas if they are certified under the procedures of this section.
 
 
 45
 Id. (emphasis added).
 
 
 46
 Congress thus vested the ICC with a broad mandate to examine closely the decisions of even certified state agencies. Otherwise, the Commission could be in no position to determine if action by an individual state had imposed a burden on interstate commerce, or whether state regulation of rates or practices had undermined the price, service flexibility, or revenue adequacy goals of the Act. The ICC was given this broad power of oversight in order to guarantee that the nation's railroads would be regulated uniformly by national standards.
 
 
 47
 The Staggers Act regulatory structure can only be properly understood when viewed against the background of the initial attempt in Congress to oust the states from any regulatory role. The resulting compromise guaranteed states that were certified to apply the national standards and regulations that they would have the initial opportunity to engage in intrastate ratemaking. In this case, the ICC's dismissal of the railroad's initial petition gave this initial opportunity to the Utah Commission. This first opportunity that resides in the states must be taken seriously by the ICC. When a state agency has acted, however, the authority of the ICC in its reviewing capacity is expansive, bounded only by the limitations of the Staggers Act and the traditional tests of administrative rationality.
 
 
 48
 Considerations of judicial deference to the expertise of an administrative agency, which will often stay a court's hand when reviewing the work of an agency, do not argue strongly here for ICC deference to the state's expertise. This is a purely statutory matter. Congress was sufficiently convinced of the ICC's expertise in the area of all rail regulation, intrastate and interstate, to empower the Commission initially to review intrastate rates where a state had either abdicated its authority entirely by opting out of the certification process, 49 U.S.C. Sec. 11501(b)(4)(B),[15] or had failed to act with sufficient speed, 49 U.S.C. Sec. 11501(d). The deference which the ICC renders to any state regulatory commission will depend upon the state's conformance to national standards and regulations in accordance with the Staggers Act, and on years of professional performance and the soundness of its decisions. Automatic deference is not written into the statute.
 
 
 49
 Nor does the 30 day statutory time limit on ICC review support Utah Power's attempt to limit the scope of ICC review. This argument is not without a surface appeal, but it is clear that Congress by requiring rapid remedial action was simply seeking to correct a past record of egregious delays that significantly burdened interstate commerce. Charges of substantial delays in correcting inadequate intrastate rates were made during the Act's progress through Congress, and the need for correcting such delays was keenly recognized. See H.R.Rep. No. 96-1035, 96th Cong., 2d Sess. 61 (1980) (disparity between intrastate and interstate rates cost rail carriers $400 million in 1977 alone).[16] Thirty days is admittedly a short period of time within which to tackle and resolve some regulatory problems, but the ICC has been regulating railroads for almost 100 years, and is highly skilled in the rate area. To make certain that the ICC will be in a position to act expeditiously upon difficult rate issues, the Act requires that the Commission maintain up-to-date standards, procedures, and data for establishing revenue levels, and annually determine the revenue adequacy for all rail carriers.[17] Indeed, it was the Commission's expertise in the area of revenue adequacy which allowed it so quickly and accurately to understand the deficiency in treatment of the issue by the Utah Commission. In sum, construing the 30 day time limit as indicating a Congressional intent to impose a limitation on the scope of review of the ICC would read far too much into that provision.
 
 
 50
 Our holding places us in agreement with the Third Circuit in Wheeling-Pittsburgh Steel Corp. v. ICC, 723 F.2d 346 (3d Cir.1983), which rejected an attempt to read into section 11501 a narrower power of review in the ICC over the action of state agencies. "We cannot agree," wrote the court, "that Congress intended that state regulatory authorities exercise a measure of discretion in the interpretation of federal standards and procedures under the Act." Id. at 353. The court concluded:
 
 
 51
 We hold that the phrase "standards and procedures" in section 11501(c) refers to standards and procedures promulgated and interpreted in decisions and orders of the ICC as well as those standards or procedures expressly incorporated in the Interstate Commerce Act. On questions of law as to whether state authorities have complied with these standards or procedures, the Commission's review is plenary.
 
 
 52
 Id. at 354-55 (emphasis added). We agree with the foregoing and also consider that the ICC, while conducting a section 11501 review, may choose to limit its review to the record complied before the state agency, or start over if it considers the case so requires. The single restraint imposed by Congress is that the process must be completed within 30 days. We will not imply a substantive limitation when Congress failed to prescribe one.[18]
 
 
 53
 We recognize the ICC's inability to bring certification of all state regulations and procedures to a quick conclusion for those states that have applied, and its slow progress in the development of specific national standards. But the Staggers Act provides its own definite national standards which can be applied, and a statute is not necessarily in need of agency regulations to make any of its statutory standards operative. An agency may elect to proceed by adjudication. We are also aware, however, that this is an era of great tumult in regulatory approach, a time of rapid change and innovation. The Staggers Act ordered some monumental changes in carrier regulation. In establishing the 30-day time table, Congress may not have accurately evaluated the extreme magnitude and difficulty of the task it was placing on the Commission with respect to its initial state certifications. Nonetheless, the ICC retains the authority and obligation to delve into state proceedings to ensure that the statutory standards of the Staggers Act are followed.
 
 
 54
 B. The Scope of Judicial Review of ICC Decisions Under Section 11501(c)
 
 
 55
 The ICC decision in this case reviews an established pre-existing rate, rather than a proposed rate, and also determined the appropriate rate. In the latter respect, the ICC states that it did not "prescribe" a rate, but rather "merely reversed the prescription [of the Utah Commission], allowing a return to the status quo ante." ICC Brief at 32-33. Here, the Commission's argument continues,
 
 
 56
 the Commission merely reversed a [Utah Commission] decision that had found the [Rio Grande-Salt Lake] rate unreasonably high, allowing a return to the presumptively reasonable rate that had prevailed beforehand. But the ICC did not mandate that the present rate be charged until the Commission rules otherwise. That would have been a prescription.
 
 
 57
 Id. at 33 (initial emphasis added). This distinction between an "appropriate" rate under section 11501(c) and a "prescribed" rate calls into play the difference between judicial and legislative action as articulated in Arizona Grocery Co. v. Atchison, Topeka & Santa Fe Railway, 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1932). The rate here had been agreed to and applied by the railroads and Utah Power for almost two years following the order of the Utah Commission. Section 11501(c), supra, directs the ICC to "determine and authorize the carrier to establish the appropriate rate." The ICC made an effort to comply with that statutory requirement when, after study of the rate base, it ruled: "we determine that the appropriate rate ... is ... $5.97 per ton." ICC Decision at 10 (JA 593) (emphasis added). In this respect, we note the ICC's statement in its brief that the Commission has not yet interpreted the "relationship, if any, between the 'appropriate rate' to be authorized under Section 11501(c) and 'reasonable rates' as used" elsewhere in the statute. ICC Brief at 34.
 
 
 58
 Courts reviewing ICC decision must approach every case that involves ratemaking with an attitude of deference towards the Commission's expertise in the area. The Supreme Court has observed:
 
 
 59
 The process of rate making is essentially empiric. The stuff of the process is fluid and changing--the resultant of factors that must be valued as well as weighed. Congress has therefore delegated the enforcement of transportation policy to a permanent expert body [the ICC] and has charged it with the duty of being responsive to the dynamic character of transportation problems.
 
 
 60
 Atchison, Topeka & Santa Fe Railway v. Wichita Board of Trade, 412 U.S. 800, 806, 93 S.Ct. 2367, 2374, 37 L.Ed.2d 350 (1973) (quoting Board of Trade v. United States, 314 U.S. 534, 546, 62 S.Ct. 366, 372, 86 L.Ed. 432 (1942)); see American Trucking Association, Inc. v. United States, 642 F.2d 916, 920 (5th Cir.1981). We have thus traditionally approached the ICC's conclusions aware of our tripartite obligation to scrutinize the Commission's action for evidence of compliance with the law, for support in the record, and for reasoned decision making. See, e.g., Consolidated Rail Corp. v. ICC, 646 F.2d 642, 647 & n. 12 (D.C.Cir.), cert. denied, 454 U.S. 1047, 102 S.Ct. 587, 70 L.Ed.2d 488 (1981).
 
 
 61
 The scope of our review of the ICC's decisions under its Staggers Act section 11501(c) jurisdiction is defined by the above-stated standards. Congress envisioned section 11051(c) as providing both for federal review of state decisions, and for an ICC rate-determination function. See supra. Traditionally, since the Supreme Court's decision three decades ago in North Carolina v. United States, 325 U.S. 507, 65 S.Ct. 1260, 89 L.Ed. 1760 (1945), the rule has been that ICC preemption of state authority must be strictly scrutinized. That pre-Staggers Act standard, however, is no longer controlling, because Congress has now explicitly granted the Commission authority over intrastate rates. Congress has preempted state regulation to the extent prescribed by the Staggers Act. The old North Carolina standard is obsolete, and the proper standard is one deferential to the economic expertise of the ICC. See Kentucky Utilities Co. v. ICC, 721 F.2d 537, 542-43 (6th Cir.1983); cf. Indianapolis Power & Light Co. v. ICC, 687 F.2d 1098, 1100 (7th Cir.1982).[19] We therefore approach this ICC decision with some deference, and review it only for its consistency with the Staggers Act, support in the record, and articulation of reasoned decision making.
 
 IV. SUBSTANTIVE ISSUES IN DISPUTE
 A. Revenue Adequacy
 
 62
 Central to our inquiry are the determinations of the Utah Commission with regard to the revenue adequacy of the Rio Grande and the Salt Lake. The ICC had already found the Rio Grande to be revenue inadequate and the revenue adequacy of the Salt Lake to be irrelevant. The Utah Commission disagreed and ruled that the Rio Grande was revenue adequate. Utah Commission Report and Order at 9, 20 (JA 94, 105). With respect to Utah Power's contention that its evidence proved the Rio Grande to be revenue adequate, it is a complete reply to rely on the finding of the ICC that the Rio Grande was revenue inadequate. In Ex Parte No. 439, Railroad Revenue Adequacy--1981 Determination, Appendix (I.C.C. Nov. 18, 1982), the ICC determined under the Staggers Act that railroads with 16.5 percent or higher return on investment had an adequate return in 1981; that the Rio Grande during that year had a return on investment of 8.09 percent and was therefore "considered revenue inadequate." Id.; cf. Ex Parte No. 416, Railroad Revenue Adequacy--1980 Determination, 365 I.C.C. 285, 287, 288 (1981) (inadequate); Ex Parte No. 393, Standards for Railroad Revenue Adequacy, 364 I.C.C. 803, 826 (1981), aff'd Bessemer & Lake Erie Railroad v. ICC, 691 F.2d 1104 (3d Cir.1982), cert. denied sub nom. Western Coal Traffic League v. United States, 462 U.S. 1110, 103 S.Ct. 2463, 77 L.Ed.2d 1340 (1983) (determinations for 1979) (same). In refusing to accept the determination of the ICC that the Rio Grande was revenue inadequate, the Utah Commission violated its obligation to comply with federal standards and procedures, in the form of federally announced general standards and a decision rendered by the ICC in conformance with the Staggers Act.[20] The determination and revision of revenue adequacy standards is expressly made a federal responsibility. See 49 U.S.C. Sec. 10704(a)(2);[21] 49 U.S.C. Sec. 10101a(3).[22] To carry out its statutory mandate, the Commission annually determines the revenue adequacy of railroads. These determinations of revenue adequacy are not mere suggestions to the state agencies: they constitute federal standards, which must be accepted by the states. The determination by the ICC of the revenue adequacy of Class I railroads in general, and the Rio Grande in particular for the relevant year, constitutes a federal "standard" which is binding on state agencies. 49 U.S.C. Sec. 11501(c); see Wheeling-Pittsburgh Steel, supra, 723 F.2d at 554-55. It is difficult to imagine a regulatory regime more nightmarish than one in which a railroad, for ratemaking purposes, would be judged revenue adequate in State A, but revenue inadequate in State B. Solely on the determination by the Utah Commission that the Rio Grande was "revenue adequate," which was contrary to the determination of the ICC--and therefore to the Staggers Act--the reversal of the decision of the Utah agency by the ICC is fully justified.
 
 
 63
 B. The ICC Rate Determination: Contested Issues.
 
 
 64
 Once the ICC decided to reverse the Utah Commission, the last sentence of section 11501(c) (emphasis added) came into play:
 
 
 65
 If the Commission determines that the standards and procedures were not in accordance with the provisions of this subtitle, its order shall determine and authorize the carrier to establish the appropriate rate, classification, rule or practice.
 
 
 66
 Congress' use of the word "shall" imposes a duty on the ICC. This mandate to first determine and then to authorize the appropriate rate was followed by the ICC in its order:
 
 Determination of Appropriate Rate
 
 67
 Under 49 U.S.C. 11501(c), when we determine, as here, that the standards and procedures applied by the State authority are not in accordance with Federal law, we must determine and authorize the carrier to establish the appropriate rate. By statute we must take final action within 30 days after receipt of the underlying petition for review. The [Utah Commission] held a full hearing to establish the appropriate rate and we have reviewed portions of the record as considered pertinent and submitted by the parties, and the decision in its entirety. Based upon our revised figures for variable costs, after correcting errors in the cost computation used by the [Utah Commission], we conclude that the assailed rate level of $5.97 per ton, which was in effect October 1, 1980, is 208.7 percent of variable costs, as explained in detail in the attached appendix. We have held rates to be reasonable where they resulted in a similar range of ratios, especially where considerations of revenue adequacy are significant. See, among other cases, No. 37014, E.I. DuPont de Nemours & Co. v. St. Louis Southwestern R. Co., et al. (not printed), served March 30, 1979 (209 to 235 percent of variable costs); and Trainload Rates on Radioactive Materials, Eastern Railroads, 362 I.C.C. 756, 775 (1980), aff'd mem., 646 F.2d 642 (D.C.Cir.1981) (213.8 to 225.7 [sic 255.7] percent of variable costs).
 
 
 68
 Here, as stated earlier, the class I[23] defendant [Rio Grande], realizes a return on investment below what is necessary for revenue adequacy. Balancing the goals reflected in Title 49 of the United States Code, especially in section 11501 and its history, the evidence before us, and practical considerations, we determine that the appropriate rate, authorized at the October 1, 1980 level, subject to intervening increases, is the rate of $5.97 per ton.
 
 
 69
 ICC Decision at 10 (JA 593) (emphasis added).[24]
 
 
 70
 At oral argument, ICC counsel contended that the Commission could remand to the state agency. While this interpretation of the Act has not been briefed or fully argued, relying solely on the wording of the Act, we cannot agree. Indeed the ICC's own decision in Petition of Louisville and Nashville Railroad Company for Review of a Decision of the Public Service Commission of Indiana Pursuant to 49 U.S.C. 11501, No. 38946 (I.C.C. June 17, 1983), speaking to the same contention, stated: "We cannot remand the case to the state authority but must establish an appropriate rate in the same decision within the 30-day time period." Id. at 20 (emphasis added).
 
 
 71
 Beyond the statutory terms of section 11501(c), and the ICC's concession in Louisville & Nashville, supra, there is an additional reason to reject the suggested approach of a remand to the state commission: the principal object of the Act is to protect the public. Both the Utah Commission and the ICC agree that these railroads exercise market dominance over this particular traffic. Utah Power, a public utility, is thus a captive customer. We cannot imply from the statute a procedure that would leave the public and Utah Power as hostages to the successful resolution of methodological debates between the federal and state agencies. The disagreements in approach between the ICC and the Utah Commission--or any other state commission for that matter--may continue for years. The wrangle may in fact be endless. To allow the ICC to simply reverse the state agency and remand the rate proceeding to the state agency is to invite a repeat performance with an only slightly altered script. In many, if not most, instances, railroads might be placed at the risk of having their intrastate rates fixed at the low threshold figure. Thus one of the evils the Staggers Act seeks to remedy would still continue. It is not the intent of the Staggers Act that threshold rates should constitute the maximum reasonable rates for intrastate traffic and require interstate rates to take up the slack in producing revenue that is adequate for sound operations; rather it seems the Act contemplates that intrastate and interstate rates should, in general, approximate parity. Furthermore, while the Utah Commission and the ICC pirouette around the technical niceties of rate-making, Utah Power must run a power plant and the public must pay the cost plus a reasonable profit. One overriding purpose of the Staggers Act is to provide reasonable rates for everybody in very short order. That purpose is frustrated if the ICC is allowed to assume only the duty of dispensing of regulatory imprimatur. If it finds fault with a state decision, the Commission must correct that fault, and it must do so within the 30 day period within which the statute commands that "final action" on the petition must be taken. 49 U.S.C. Sec. 11501(c).
 
 
 72
 However, we cannot affirm the decision by the ICC to allow the original rate to stand unless the Commission's "underlying cost calculations are substantiated in the record." San Antonio, Texas, supra, 631 F.2d at 837. Because we have some doubt that certain of the ICC's cost calculations have fully adequate evidentiary support in the record, we remand the case to the ICC so that it may reexamine the data and then "determine and authorize the appropriate rate" that it finds to be justified under applicable federal standards and procedures.
 
 
 73
 Utah Power poses a number of distinct cost-based challenges to the ICC's handling of rate inquiry. The Utility argues that the ICC's cost appendix is fundamental to its decision, because the variable costs associated with the traffic are critical to a determination of the revenue/variable cost ratio of the movement, which is in turn central to an inquiry into the determination of the appropriate rate. Utah Power asserts that the appendix contains at least three crucial errors regarding cost calculations--errors which allegedly undermine the ICC's declaration that the rate in issue was appropriate. Specifically, the Utility asserts that ICC's reversal of three of the Utah Commission's cost findings were clearly erroneous: (1) the cost of interchange switching (per car); (2) the cost of UP's switching expense (per car); and (3) the cost of origin switching at the mine. Utah Power further argues (4) that the ICC completely failed to review an "alternate holding" of the Utah Commission--"that the rates at issue are excessive even if the railroads are not revenue adequate." Utah Power Reply Brief at 33. Finally, the Utility asserts (5) that the ICC misunderstood the scope of the Salt Lake's role in this movement, deciding erroneously that the Rio Grande's role as "predominant" carrier rendered the analysis of the revenue position of the Salt Lake irrelevant. We consider these contentions in order.
 
 1. Rio Grande Interchange Switching
 
 74
 One issue is the cost of Rio Grande yard crews at Salt Lake City, who receive the consist from the road crews after the trip from the mine and move the loaded coal cars to the Union Pacific. Railroad crews are prohibited by law from operating for more than 12 hours in a single day, and the round trip from Salt Lake City to the mine and return generally takes about 12 hours. Thus a relief Rio Grande crew is frequently needed to deliver the consist to the UP (JA 531-32).
 
 
 75
 Utah Power contends that 10 other coal cars destined for other consignees are frequently added to the 35 that are normally destined for Utah Power's Gadsby Plant, and that the added cost of switching these extra cars should not be allocated to the movement of the coal cars consigned to Utah Power. Out of 13 movements in the record that were checked, it appears that only four consisted solely of 35 cars in the Rio Grande train destined for Utah Power; the other nine trains initially included 10 additional cars destined for another consignee. On this evidence, the Utah Commission refused to include any of the cost of the relief crew in the rate it ordered because of the allegation that the relief crew was only required because of the additional 10 cars of another shipper. There is testimony, however, that the relief crew did not do anything with the ten added cars (JA 271). In any event, a relief crew was required after 12 hours and the movement from the mine was always operating close to the maximum time limit. Under such circumstances, recognizing the frequency with which train delays occur, even where operating conditions are closer to ideal, it was reasonable for the Rio Grande to provide a relief crew. It was also not necessary for the regular train crew to work a full 12 hours. Twelve continuous hours was the absolute statutory time limit for operating train crews; there is good reason, though, for safety reasons, that operating train crews should not always be pushed to the maximum time limit. Therefore, we find that the reasonable cost of the relief crews was validly included in computing the rate.
 
 
 76
 The costs associated with the number of locomotives used in switching coal cargoes between railroads are also at issue. The railroads argued before the ICC that the determination by the Utah Commission of these switching costs was inappropriate because it should have considered the actual number of locomotives used in the switching, not the average number of units used, as had been the case at the Utah Commission (JA 124). Utah Power did not challenge this point, but argued further that the railroads' figures were still fatally flawed in that the carriers would "assign the entire cost of those locomotives to [Utah Power's] coal traffic when the cause of the additional cost is the additional cars for other shippers that are sometimes part of the [Rio Grande] train" (JA 190). Utah Power contended that ["t]he additional costs should be assigned to the additional cars that cause the delay" (JA 190-91). If, as stated above, the relief crew did nothing with the 10 cars, the Utility's point is flawed. The exact proportional amount may not be easily discernible, but doubtlessly the major portion of the cost of the coal movement must be attributed to Utah Power. The ICC's response professed an inability to resolve this particular question:
 
 
 77
 In view of the partial evidence from the Utah proceeding available, we are not able to affirmatively comment on this issue. Based upon our customary procedures whereby use of locomotive units differing in number from the Rail Form A average may be reflected, we accept petitioners' adjusted cost as the best available evidence.
 
 
 78
 ICC Decision, Appendix at 3 (JA 598). On this factual record we are unable to declare with certainty that either party is correct on this issue, but we are certain that the locomotive costs that are properly allocable to the movements in issue have not been precisely determined. The difference in the amounts in dispute may be de minimis but it seems appropriate, when the case is being remanded, to obtain accurate evidence. On remand the ICC should further investigate the facts relevant to this issue.
 
 2. The Union Pacific Switching Charge
 
 79
 Utah Power challenges the inclusion of the Union Pacific's charge, rather than its cost, for switching loaded coal cars from the Rio Grande to the Salt Lake and the empty cars from the Salt Lake to the Rio Grande for the next trip. The Utility contends that the switching arrangement between the railroads is reciprocal, and that the switching charge will not be imposed in the near future. Therefore, Utah Power concludes, only the actual variable cost of the movement may properly be included. Utah Power contends that the actual cost to the Rio Grande of the reciprocal switching arrangement with the Utah Power was not established.
 
 
 80
 In our view, it was proper to include the "charge." If we understand the arrangement, it is the "charge" imposed that must be satisfied by supplying services of equivalent value. That being the basis of the arrangement between the railroads, we see no reason to depart from it because of the payment in reciprocal services. The cost to the Rio Grande is real even if the method of payment is by the provision of equivalent service rather than by check. Whether the charge will be imposed in the near future is irrelevant to the decision which this case requires. As to whetherthe Rio Grande's reciprocal switching services offset those of the UP, the Rio Grande and Utah Power each contends that the other did not produce evidence to substantiate its position. On remand the ICC may, in its discretion, further investigate the facts relevant to these claims.
 
 3. Origin Switching
 
 81
 Utah Power contends that none of the origin switching cost (roadway maintenance cost at Clear Creek) was substantiated, and therefore that none should be allowed. The ICC assigned only 30 percent of these total costs to the Rio Grande's operation. The ICC decision states that it is impossible to determine the parties' differences because adequate evidence had not been introduced in the record. ICC Decision, Appendix at 2 (JA 597). However, based upon what was termed a "reasonable interpretation" of the testimony of the mine officer that origin switching occurred on tracks "predominantly owned" by the mining company, the ICC concluded that 30 percent was a "fair approximation" of the costs that could reasonably be allocated to the Rio Grande. Id. We are uneasy with the ICC's indication that the record does not contain adequate evidence on this issue. In determining a rate, the ICC cannot simply throw up its hands on what may be a crucial inquiry. Consequently, on remand this issue may be opened for Utah Power to submit evidence and for the Rio Grande to respond. If no additional evidence is introduced, Utah Power may be found to waive any objection to this item and the ICC may determine that 30 percent of the costs was properly allocated to the rate.
 
 
 82
 Utah Power also questions this cost, contending that the mine operators made a massive loan to the railroad for rehabilitation of the tracks to the mine, upon which loan the Utah Commission "could justifiably have relied in [totally] excluding this item of costs from the costs of the movement." Utah Power Reply Brief at 31. The terms of the loan are not set forth. The fact that costs may have been paid by the proceeds from a loan, however, does not in any way alter the fact that costs were incurred. Ordinarily loans must be repaid. Thus, such costs should not be eliminated in computing the rate merely because they may have been paid from the proceeds of a loan. On remand, the ICC may reopen the record to any evidence that may indicate the circumstances, or the terms of the loan, that might justify the exclusion of the costs to which the proceeds from the loan were applied.
 
 4. The Alleged Rate Excessiveness
 
 83
 Utah Power also rests on the Utah Commission's alternative holding that the Rio Grande rates at issue were excessive even if the railroads were not revenue adequate. The Utah Commission concluded on the law:
 
 
 84
 17. ... Even if [the Rio Grande and the Salt Lake] did not have adequate revenues, however, they would not be free to charge higher rates for traffic than we have ordered. The rate level we are permitting (181.2% of variable costs) is generous to the railroads, and provides for a considerable subsidy for other traffic. Congress did not intend that a railroad's revenue inadequacy would justify any rate. Staggers Rail Act of 1980, Report of the Committee on Conference on S.1946, H.R.Rep. No. 1430, 96th Cong., 2d Sess. 92 (1980).
 
 
 85
 Utah Commission Report and Order at 20-21 (JA 105-06). This conclusion rests completely on the reasonableness of a rate level permitting a return of 181.2 percent of variable costs of the transportation in question, as those costs were computed by the Utah Commission. On this point the decision of the ICC states:
 
 
 86
 Constant costs do not appear in the [Utah Commission] decision. To reiterate from our earlier observations, we do not endorse [the] approval of the double-rate-of-return device (181.2 percent factor) as applied to the variable cost to determine the maximum rate.
 
 
 87
 ICC Decision, Appendix at 5 (JA 600). While "the double-rate-of-return" standard might develop a rate that was reasonable under some circumstances, there is no justification for applying it rigidly as the maximum reasonable rate. Clearly, rates in excess thereof can still be found to be reasonable. The Utah Commission thus acted unlawfully when it applied a rigid double-rate-of-return standard --particularly when that standard was used as a device to rule unreasonable a rate that the Utility and the railroads had agreed upon and which the Utah Commission had ordered filed two years earlier. This was not a proposed rate, but was an existing rate that the parties agreed to and without objection the Utah Commission had ordered published. In the Matter of the Application of the Denver and Rio Grande Western Railway Company to Publish Freight Tariff 4166, No. 79-398-07 (Public Service Commission of Utah, 1979); see ICC Decision at 5 (JA 588).
 
 
 88
 Under such circumstances, the issue presented to the Utah Commission was whether the existing rate was unreasonable, not whether the state agency could fashion a lower rate that would in its view be borderline reasonable. In this respect, it seems that the Utah Commission has refused to recognize one lesson that the enactment of the Staggers Act sought to impress upon state agencies with respect to their regulation of intrastate rates: that the old home-town preferential rates that operated to deny railroads adequate revenue, and shift a substantial part of the burden of adequately supporting railroad operations to interstate traffic, were to be abolished. If state agencies in prescribing rates could hold all intrastate rates to mere bare-bones reasonableness--which they might, given the local demands on state agencies--railroads would still face revenue problems as costs and rates became outmoded and rates forced by competition were insufficient. Also, the delay factor in implementing new rates, which will always exist to some degree, could tend to keep intrastate traffic from paying an equal share of the cost of the necessary service it receives. This could lead to acute problems of revenue adequacy for railroads such as the Rio Grande, which apparently derives such a large portion of its revenue from intrastate operations. The Staggers Act mandates that the ICC prevent these abuses.
 
 
 89
 ICC precedents support its decision in this case. The Utah Commission found the rate excessive and ordered its reduction to one embodying 181.2 percent of variable costs. Utah Commission Report and Order at 20 (JA 105). The existing Rio Grande rate, according to the ICC, represented "208.7 percent of variable costs...." ICC Decision at 10 (JA 593). In contrast to the decision of the Utah Commission holding such percentage to provide an "excessive" return, the ICC has determined that where considerations of revenue adequacy were significant, rates within the area of the Rio Grande's 208.7 percent were reasonable. For instance, a rate of 209-235 [sic 255] percent of variable costs was held reasonable in E.I. DuPont de Nemours & Co. v. St. Louis Southwestern Railway, No. 37014 (1979).[25] While such determinations do not constitute fixed federal standards that must be followed by state agencies in setting every intrastate rate, they do establish a general range of rate reasonableness that must be respected by state agencies. The rates set by the Utah Commission here were substantially below the range of rates found to be reasonable by the ICC and under current ICC decisions were not the maximum reasonable rates as asserted by the Utah Commission. We cannot find unreasonable a rate that is within the range established by applicable federal precedents. Thus, we disagree with the Utah Commission that the rate at issue exceeded a reasonable maximum. Between the approaches of the two Commissions, we find that of the ICC to be more in keeping with the Staggers Act.
 
 5. The Salt Lake's Revenue Adequacy
 
 90
 The ICC did not consider the revenue adequacy of the Salt Lake, allegedly because Utah Power did not question the Commission's decision that the Rio Grande was the "predominant" carrier and that the Salt Lake's revenue adequacy could not be a "determinative" factor. ICC Brief at 37-38. We cannot fully agree with the substance of this conclusion.
 
 
 91
 The complete trip from the Gadsby Plant to the mine at Clear Creek and return takes approximately 12 hours for the Rio Grande train crew. Before and after such trips, the Salt Lake breaks the consist into two parts and moves it a line-haul distance of 0.37 miles (round trip 0.75 miles). These complete operations by the Salt Lake, while they cover only a short distance, take almost eight hours. Furthermore, the coal movement for Utah Power represents approximately 75 percent of Salt Lake's total car traffic, and approximately 50 percent of its ton miles. Utah Power Reply Brief at 36. In this movement the Salt Lake operates as a "line-haul carrier" rather than a switching operation. In view of the amount of time involved in this operation, we have some difficulty with the ICC not reaching the possible effect of the revenue adequacy of the Salt Lake "because it found [Salt Lake's] role in the rail movement here to be a minor one." ICC Brief at 37. We require the ICC on remand to consider the revenue adequacy and costs of the Salt Lake, and to give those factors such weight in determining the final rate as may be justified. We recognize that the ICC did accept Utah Power's development of Salt Lake's costs for purposes of its decision. ICC Decision, Appendix at 4 (JA 599). We cannot be sure, however, of the extent that the rate might be modified if the ICC considers the revenue adequacy of the Salt Lake.
 
 
 92
 V. CONCLUSION: THE OBLIGATION OF THE ICC UPON REMAND
 
 
 93
 We fully agree with the ICC that the "cost appendix, as dicta, even if replete with error, could not affect the fundamental rationality of reversing the [Utah Commission's] rate-reducing prescription order." ICC Brief at 39. The ICC's obligation, however, extends beyond setting forth the errors of the state commission. As we have stated, supra, the ICC must determine the appropriate rate and authorize the carrier to establish it. This responsibility the Commission may not evade. In this respect, the Commission's decision is somewhat suspect, and we therefore remand the case to the ICC for reconsideration of the appropriate rate, and for a determination of whether any reparations are required in light of that reconsideration.
 
 
 94
 While we remand in part, we recognize that there is considerable rationality in the ICC merely determining that $5.97 per ton was an "appropriate rate" when the parties had agreed to that rate, the Utah Commission had ordered it filed, the parties had, without objection, operated under it for almost two years, and the Utah Commission in finding it to be excessive had refused to follow federal standards and procedures with respect to revenue adequacy as determined by the ICC. Of course, the present situation is thus not one that usually arises under the statute which ordinarily involves an ICC review of a proposed intrastate rate initiated by the carrier, opposed by the shipper and ruled on initially by the state agency. Here the ICC has dealt with a pre-existing rate that was lawfully established and placed in effect, and which was subsequently attacked on a fundamentally incorrect basis. Nonetheless, the finding that the rate is reasonable appears to rest in some part upon significantly incomplete data. Thus, a partial remand is necessary.
 
 
 95
 We sympathize with the time pressures on the ICC that were institutionalized by the Staggers Act. But the statutory obligations and deadlines within which its duties must be performed cannot be avoided. We agree with the Third Circuit's conclusion that Congress did not intend that "this brief period authorizes the ICC to issue orders lacking in reasoned explanation." Wheeling-Pittsburgh Steel Corp., supra, 723 F.2d at 357; see Kentucky Utilities, supra, 721 F.2d at 545 ("It is not persuasive to argue that the statute cannot apply simply because it is burdensome.")
 
 
 96
 Subject to the limitations stated above, we affirm the decision of the ICC to reverse the decision of the Utah Commission, but remand the case on the issue of the evidentiary support for the reasonableness of the rate for further review, reconsideration and decision by the ICC within 30 days of the service of the mandate.
 
 
 97
 Judgment accordingly.
 
 
 98
 GINSBURG, Circuit Judge, concurring statement on exhaustion of administrative remedies, in which Circuit Judge WILKEY joins:
 
 
 99
 I concur in all of Judge MacKinnon's able opinion except Part II.A. As to the issue analyzed in that section, I state my position separately.
 
 
 100
 In his discussion under the heading "Exhaustion of Administrative Remedies," Judge MacKinnon ultimately settles on the view that the futility exception applies in this case. See supra p. 729. My view of the matter is less complex. I see no need to consider "exceptions"; the Railroads, I think it clear, confronted no relevant exhaustion rule in the first place. I write separately to describe the straighter path I follow on this threshold issue.
 
 
 101
 As an opening argument, Utah Power & Light Co. (UPL) asserts that "[t]he ICC lacked jurisdiction to review the Utah PSC's Decision because [the Railroads] failed to exhaust their remedies before the Public Service Commission of Utah." Brief of Petitioner at 12. Specifically, UPL claims that, for want of a rehearing petition filed with the Utah PSC, we must reverse the ICC's decision. The Railroads' failure to ask the PSC to reconsider its decision, UPL maintains, left the ICC powerless to proceed. In support of this alleged jurisdictional lockout, UPL cites solely provisions of Utah law: UTAH CODE ANN. Sec. 54-7-15[1] and Rule 19 of the Rules of Practice of the Utah PSC.[2] This is topsy-turvy argument.
 
 
 102
 The ICC's jurisdiction is not Utah's to give or take away. And exhaustion requirements are imposed by the legislature that controls the reviewing authority whose jurisdiction is invoked, or by a tribunal superior to that authority, or by the authority itself, not by the forum of first resort whose determinations are subject to review. Concretely, Congress, not Utah's lawmakers, determines the ICC's jurisdiction. Congress again, and sometimes the federal courts that review ICC decisions or the ICC itself, may delineate avenues complainants must exhaust before approaching the ICC. But it is not Utah's prerogative, or that of any of its sister states, to dictate rules on recourse to the ICC.[3]
 
 
 103
 UPL's inversion of state/federal lines of authority has occasioned some confusion in the parties' briefing. Two examples should suffice to clear the air on this fundamental matter. A person in state custody may petition a federal court for a writ of habeas corpus, 28 U.S.C. Sec. 2254 (1982), but he or she may not do so without exhausting state court remedies. Rose v. Lundy, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). A person suing a state official in a federal court for an alleged deprivation of a federal right, pursuant to 42 U.S.C. Sec. 1983, need not exhaust or even begin to pursue state remedies. Patsy v. Board of Regents, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). In both cases, federal law determines the jurisdiction of the federal forum and the existence vel non of an exhaustion requirement. A state favoring a state remedy exhaustion requirement before a federal forum proceeds may so indicate by the vote of its representatives in Congress.[4] A vote in the state's own legislature for exhaustion of state remedies as a precondition to a challenge in a federal forum, however, would be unavailing.
 
 
 104
 In the matter at hand, the ICC entertained the Railroads' petition pursuant to the authority (jurisdiction) conferred upon the Commission by Congress. The jurisdiction-conferring provision, 49 U.S.C. Sec. 11.501(c), reads in pertinent part: "Any rail carrier ... may petition the Commission to review the decision of any State authority, in any administrative proceeding in which the lawfulness of an intrastate rate ... is determined." The Utah PSC rendered a decision adverse to the Railroads in an administrative proceeding to determine the lawfulness of an intrastate rate. The Railroads, in compliance with ICC procedure, petitioned the Commission to review that decision. Congress required no more. See Texas v. United States, 730 F.2d 409 (5th Cir.1984). The federal legislature said nothing of applying for rehearing before the PSC or pursuing any other state avenue for relief from the PSC's decision.
 
 
 105
 Nor has any federal court, in reviewing an ICC decision, ever created an "exhaust state remedies" or "exhaust state remedies further" requirement. See Florida v. United States, 282 U.S. 194, 51 S.Ct. 119, 75 L.Ed. 291 (1931); North Carolina v. ICC, 347 F.Supp. 103 (E.D.N.C.1972), aff'd mem., 410 U.S. 919, 93 S.Ct. 1362, 35 L.Ed.2d 582 (1973); North Carolina v. United States, 128 F.Supp. 718, 724 (E.D.N.C.) (assertion that ICC is "without jurisdiction to order increase of intrastate rates until remedies under state law had been exhausted" is "[c]ertainly ... without merit"; "[t]he Commission in discharging the duties imposed upon it by Congress may not be delayed by proceedings before state courts or commissions"), aff'd mem., 350 U.S. 805, 76 S.Ct. 45, 100 L.Ed. 723 (1955).[5] The federal courts' refusal to impose on the ICC's administrative authority a total-exhaustion-of-state-remedies requirement is hardly surprising. It is true that, as a matter of federal law, federal courts have generally denied requests to enjoin the enforcement of state administrative decisions where the grievant has not pursued adequate and available state administrative remedies. See C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE Sec. 4233 (1978). That form of temporary abstention, however, is inapposite to ICC oversight of intrastate rates. Congress considered placing the entire regulation of intrastate rates in the hands of the ICC. See H.R.REP. NO. 1035, 96th Cong., 2d Sess. 61, reprinted in 1980, U.S.Code Cong. & Ad.News 1980, p. 3978, 4006; 126 CONG.REC. 18,298 (1980). It ultimately chose to give the ICC a unique, expedited oversight role in establishing intrastate rates while maintaining a requirement of initial, but not totally exhaustive, resort to state PSCs. 49 U.S.C. Sec. 11,501. The expedited ICC administrative control for which Congress provided is not comparable to judicial review of agency action; the equity, comity, and restraint considerations that have led federal courts to defer federal judicial review until state proceedings have run their full course, see Prentis v. Atlantic Coast Line Co., 211 U.S. 210, 229, 29 S.Ct. 67, 70, 53 L.Ed. 150 (1908), are not tailored to fit the prompt ICC administrative superintendence Congress ordered. Thus, the only even barely plausible support UPL can muster for its "state law controls access to ICC" argument is that the ICC itself so ordered.
 
 
 106
 UPL's reasoning runs this way. The Staggers Rail Act of 1980 permits a state commission to exercise jurisdiction over intrastate rates only "if such State authority exercises such jurisdiction exclusively in accordance with [federal prescriptions]." 49 U.S.C. Sec. 11,501(b)(1). Within 120 days after the effective date of the Staggers Act state authorities seeking to continue exercising jurisdiction over intrastate rates had to submit their intrastate rail carriage regulatory standards and procedures to the ICC. Id. Sec. 11,501(b)(2). Within ninety days after receipt of a state authority's standards and procedures, the ICC had to decide whether to certify the state authority as an agency for intrastate rail transportation regulation. Id. Sec. 11,501(b)(3)(A). A state authority denied certification "may not exercise any jurisdiction over intrastate rates"; one granted certification may exercise jurisdiction using "its standards and procedures." Id. Sec. 11,501(b)(4)(A). "The ICC certified the Utah PSC under 49 U.S.C. Sec. 11501 to exercise jurisdiction over intrastate rail traffic in accordance with the PSC's rules of practice," UPL reports. Brief of Petitioner at 7-8. The PSC's rules provide for rehearing petitions. Therefore, UPL concludes, for want of a rehearing petition addressed to the Utah PSC, the Railroads may not complain about the PSC's decision to the ICC.
 
 
 107
 The assertion that the ICC approved a PSC rehearing petition as a precondition to its own jurisdiction is vulnerable on several counts. First, the ICC's certification of the Utah PSC's intrastate rate regulation remains provisional. The ICC simply accepted the state's representation that it "inten[ded] to exercise jurisdiction consistent with the law." State Intrastate Rail Rate Authority, 364 I.C.C. 881, 883 (1981); see also Illinois Central Gulf Railroad Co. v. ICC, 720 F.2d 958, 959 (7th Cir.1983). The Commission deferred close inspection of state standards and procedures and has not yet rendered considered determinations on the consistency of state prescriptions with federal law. See id. at 959-60. Second, even after final certification, a state commission's practices will remain subject to adversary testing in proceedings before the ICC to review state decisions. See 49 U.S.C. Sec. 11,501(c) (railroads petitioning for ICC review may challenge state standard or procedure alleged to be inconsistent with governing federal law).[6]
 
 
 108
 Finally and predominantly, the overriding purpose of the Staggers Act provisions on federal-state relations was to insure that federal goals (price and service flexibility and revenue adequacy) would not be "undermined by state regulation." H.R.REP. NO. 1430, 96th Cong., 2d Sess. 106 (1980) (Conference Report). A court would disserve that purpose were it to embrace the position UPL espouses. The Utah PSC's rate reduction and award of reparations would stand without ICC oversight based on an utterly fanciful assumption--that the ICC in fact adverted to and adopted Utah's local law on PSC rehearing petitions, thereby rendering that fragment of state law an impenetrable barrier to access to the ICC's ultimate superintendence.
 
 
 109
 To be sure, although a rehearing petition requirement before a party repairs to a review forum risks delay, that risk may be counterbalanced by significant benefits. For example, a rehearing request affords the tribunal of first resort a chance to correct its own errors and to improve the quality of the record the review forum will receive. Cf. Athlone Industries, Inc. v. Consumer Products Safety Commission, 707 F.2d 1485, 1488-89 (D.C.Cir.1983) (discussing exhaustion of administrative remedies generally). But such a requirement, when imposed, should reflect a considered judgment that, in the particular context, the gain is significant enough to brook the delay.[7] It is safe to say that no such judgment was made here--not by Congress, the federal judiciary, or the ICC, the only authorities empowered to make it.
 
 
 110
 Instead, when Congress settled on the Staggers Act provisions reducing the authority of state regulatory bodies while increasing the ICC's monitoring role in intrastate regulation, delay was a paramount concern. See Wheeling-Pittsburgh Steel Corp. v. ICC, 723 F.2d 346, 354 & n. 19 (3d Cir.1983); H.R.REP. NO. 1035, 96th Cong., 2d Sess. 61, 130 (1980) (House Report). Congress was also mindful that the regulatory standards and procedures of the several states differed substantially from one another and from those of the Commission; Congress sought to reduce the disparity and to promote consistent practices. See id. at 128; see also Indianapolis Power & Light Co. v. ICC, 687 F.2d 1098, 1100 (7th Cir.1982); 126 CONG.REC. 18,298 (1980) (statement of Rep. Broyhill introducing predecessor to current section 11,501). In view of these concerns, I am confident that the ICC correctly rejected the Utah PSC's rehearing requirement as a reason for closing its door to the Railroads' complaint.
 
 
 
 [1]
 Half of the 236-mile trip is carrying mostly empty gondolas up steep grades, as the rail route involves mountainous terrain. The return to the mine starts at Salt Lake City at an elevation of approximately 4238 feet above sea level, climbs to Soldier Summit at 7443 feet, drops to 7176 feet at Colton, and then climbs to 8303 at Clear Creek. This is a total climb of 4332 feet in 118 miles, and thus involves substantial grades. In railroad operations the grade of the roadbed over which the consist moves is one of the most vital cost factors. Elevations are derived from U.S. Department of Interior, Geological Survey maps: Scofield, Soldier Summit, and Salt Lake City South, Utah quadrangles
 
 
 [2]
 Section 229 provides:
 (a) Any rate that is in effect on the effective date of this Act for transportation by a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I of chapter 105 of title 49, United States Code, may, during the 180-day period beginning on such effective date, be challenged in a complaint filed with the Interstate Commerce Commission by any interested party alleging that the rail carrier has market dominance over the transportation to which the rate applies, as determined under section 10709 of such title, and that the rate is not reasonable under section 10701a of such title.
 (b) Any rate described in subsection (a) of this section--
 (1) which is not challenged in a complaint filed within the 180-day period provided in such subsection; or
 (2) which is challenged in such a complaint, but (A) the rail carrier is found not to have market dominance over the transportation to which the rate applies, or (B) the rate is found to be reasonable,
 shall be deemed to be lawful and may not thereafter be challenged in the Commission or in any court (other than on appeal from a decision of the Commission).
 * * *
 (d) The burden of proof in any proceeding under this section shall be on the complainant.
 Pub.L. No. 96-448, 94 Stat. 1895, 1934 (1980) (codified in scattered sections of Title 49, U.S.Code).
 
 
 [3]
 Valcam is the tariff name for Valley Camp mine near Scofield, Utah, and Gadsby is the tariff name for the generating plant of Utah Power in Salt Lake City, Utah
 
 
 [4]
 Ex Parte No. 388, State Intrastate Rail Rate Authority, 46 Fed.Reg. 23335 (Apr. 24, 1981); 47 Fed.Reg. 5786 (Feb. 8, 1982)
 
 
 [5]
 This subchapter provides for the "Jurisdiction" of the ICC over "Rail, Rail-Water, Express, and Pipe Line Carrier Transportation." See 49 U.S.C. Sec. 10501 (Supp. V 1981)
 
 
 [6]
 126 Cong.Rec. 17,793 (1980) (statement inserted by Rep. Madigan) ("H.R. 7235 establishes federal preemption for jurisdiction over intrastate rates.")
 
 
 [7]
 As amended, 1981 Utah Laws 1126, 1132, ch. 215, Sec. 5, the statute provides (emphasis added):
 Before any party, stockholder, bondholder, or other person pecuniarily interested in the public utility who is dissatisfied with an order or decision of the commission may commence legal action, the aggrieved party or person shall first proceed as provided in this section.
 (1) After any order or decision has been made by the commission any party to the action or proceeding, or any stockholder or bondholder or other party pecuniarily interested in the public utility affected, may apply for review or rehearing in respect to any matters determined in said action or proceeding specified in the application.... The application shall set forth specifically the grounds on which the applicant considers such decision or order to be unlawful. No applicant shall in any court urge or rely on any ground not set forth in the application....
 
 
 [8]
 See n. 10, infra
 
 
 [9]
 The topical heading to the earlier rehearing provision read: "Rehearings--Necessary for recourse to courts--Stay." Utah Code Ann. Sec. 54-7-15 (1953); L.1917, ch. 47, art. 5, Sec. 14
 
 
 [10]
 Rule 19 provides (emphasis added):
 (a) Section 19.1 Time for Filing:
 Petitions for rehearing must be filed by a party or a stockholder or bondholder, or other party pecuniarily interested in the public utility affected, in accordance with Section 76-6-15, Revised Statutes of Utah, 1933,[*beforetheeffective date of such order or decision, or if such order or decision becomes effective prior to twenty (20) days after its date before twenty (20) days after the order or decision.
 ....
 (f) Section 19.6 Judicial Review:
 Within thirty days after the rendition of the decision on rehearing, any party to the proceeding deeming himself aggrieved by such order or decision, may apply to the Supreme Court for a writ of certiorari for the purpose of having the lawfulness of the original order or decision of the rehearing inquired into and determined.
 
 
 *
 This reference to Sec. 76-6-15 is to the codification of the rehearing requirement that was the statutory predecessor to Sec. 54-7-15. Refer to the legislative history following Utah Code Ann. Sec. 54-7-15
 
 
 [11]
 A decision of the ICC is final on the date on which it is served and exhaustion of further administrative remedies is not required. At 49 U.S.C. Sec. 10327(i), the Staggers Act provides (emphasis added):
 Notwithstanding this subtitle, an action of the Commission under this section and an action of a designated division under subsection (c) of this section is final on the date on which it is served, and a civil action to enforce, enjoin, suspend, or set aside the action may be filed after that date.
 
 
 [12]
 "[The Utah Agencies] hereby adopt and incorporate by reference the entirety of the Brief of Petitioner [Utah Power]." Utah Commission Brief at 1
 
 
 [13]
 Because we are at the beginning stages of interpreting the Staggers Act I consider it advisable to comment on what in my opinion are erroneous concepts in the concurring opinion on the established doctrine of exhausting administrative remedies. Contrary to the assertion in the concurring opinion, Utah does not contend that it has the right, apart from any federal law, to give or take away the jurisdiction of the ICC. Utah merely contends that when their State Commission procedures were approved by the ICC as conforming with federal standards under the Staggers Act that the railroads were required to exhaust the approved state administrative rehearing provision before the decision of the Utah Commission could be considered final and subject to review by the ICC. This is not a far fetched argument; and it is wide of the mark for the concurrence to state that no federal court in reviewing an ICC decision ever judicially created an "exhaust state remedies requirement." The federal courts did not need to, because, as the current Fifth Circuit decision in Texas v. United States, 730 F.2d 409 (5th Cir.1984), quotes the ICC as stating that generally the ICC did require exhaustion of state administrative remedies, i.e.:
 The ICC stated in its opinion that it generally requires railroads to exhaust their remedies before state agencies, if the state's procedures are consistent with federal procedures. [Here the state procedures had been certified by the ICC as consistent with federal procedure.]
 Texas v. United States, 730 F.2d at 414 (emphasis added). The concurrence tries to worm out of this ICC statement by asserting that the rehearing requirements can be avoided because the certification of the state procedures was only "provisional." That is a quibble. The ICC did certify the state procedures, and while the certification continues it is a certification, but of course that does not operate to override contrary federal law.
 Porter v. Investors Syndicate, 286 U.S. 461, 468, 471, 52 S.Ct. 617, 619, 620, 76 L.Ed. 1226 (1932), indicates that exhaustion of state administrative remedies is generally required as a matter of practice and basic federal common law. As stated above that is the ICC's general policy. It is a very salutary rule. It makes it possible for a state commission to correct its own errors and stop the parties from running to the federal courts and clogging up their calendars every time there is some minor error in a state administrative decision. As Justice Brennan remarked concurring in Fair Assessment in Real Estate Ass'n v. McNary, 454 U.S. 100, 121 n. 5, 102 S.Ct. 177, 188-9 n. 5, 70 L.Ed.2d 271 (1981), the "exhaustation of administrative remedies ... reflects principles of avoidance of unnecessary litigation ...." Federal common law generally requires exhaustion of administrative remedies. The oft-cited decision of Myers v. Bethlehem Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938), and cases cited at 51, n. 9, 58 S.Ct. at 463, n. 9, hold "... it is a long settled rule of judicial administration that no one is entitled to judicial relief ... until the prescribed administrative remedy has been exhausted." This rule is as applicable to state administrative agencies as to federal administrative agencies. Cf. Porter v. Investors Syndicate, supra; First Natl. Bank v. Weld County, 264 U.S. 450, 453, 44 S.Ct. 385, 386, 68 L.Ed. 784 (1924); Pacific Livestock Co. v. Oregon Water Bd., 241 U.S. 440, 36 S.Ct. 637, 60 L.Ed. 1084 (1916); Prentis v. Atlantic Coast Line, 211 U.S. 210, 29 S.Ct. 67, 53 L.Ed. 150 (1908) (a similar railroad rate case involving an intrastate rate and the state regulatory agency). This procedural rule may apply "[e]ven where the statutory requirement of exhaustion is not explicit ..." Patsy v. Florida Board of Regents, 457 U.S. 496, 502 n. 4, 102 S.Ct. 2557, 2561 n. 4, 73 L.Ed.2d 172 (1982).
 Utah's argument is thus not made out of whole cloth; my disagreement with its application here, as stated above, is grounded upon the existence of a certain well recognized exception to the general rule, and there are a number, but Utah's contention does have some partial validity. One exception to the exhaustion rule, which as stated above is controlling here, is based on the futility of further state proceedings because the Utah Commission throughout has continued to stand by its decision on all issues. The statement in the concurring opinion concerning possible delay is not overlooked, but where the rate continues in effect during litigation, as opposed to a proposed rate, the potential harm to the railroad is minimal. Another reason stated above is that Utah's rehearing provision is not absolute.
 The statement in the concurring opinion which implies that some benefit might result to "a state favoring a state remedy exhaustion requirement before a federal forum proceeds [if it ] so indicate[d] by the vote of its representatives in Congress," is pure unworkable fantasy. Concurring op., p. 3 (emphasis added).
 And the further statement in the concurring opinion that federal courts deferring judicial review until state administrative proceedings have run their full course were "not tailored to fit the prompt ICC administrative superintendence Congress ordered" is too general. It has only limited relevance to this case. The ICC did order the State Commission to handle this case in the first instance. A different situation would exist where delay during state agency litigation would deprive a railroad of needed revenue from a proposed rate, but that is not this case.
 
 
 [14]
 And as above indicated the official record of the ICC states that the "DATE OF FILING/SERVICE" of the "LETTER: Transmitting corrections in item #1 [Petition] above.", was "2/2/83." (JA 3). If this date controlled the service of the opinion on March 2, 1983, it would still be within the prescribed period of 30 days
 
 
 [15]
 At the time of the ICC decision in Ex Parte No. 388, State Intrastate Rail Rate Authority, 47 Fed.Reg. 5786 (Feb. 9, 1982) only 36 states were certified to exercise jurisdiction over intrastate railroad rates under Sec. 214 of the Staggers Rail Act of 1980
 
 
 [16]
 While this case involves a pre-existing rate, the necessity for quick resolution of intrastate rate disputes can be envisioned by the facts of this case. At oral argument counsel for Utah Power stated "that coal freight revenues account for 48% of [the Rio Grande's] total revenues and they have been constantly increasing over the last 10 years...." Since the Rio Grande only operates in two states, Colorado and Utah, and, as counsel remarked, the coal is mined in both states, most of the revenue from coal traffic is undoubtedly based on intrastate rates, the principal population, industrial centers and coal mines being located where they are. Under such circumstances, with the railroad being dependent on intrastate coal freight revenues for such a large part of its income, and having been determined by the ICC to be revenue inadequate, it is extremely important that such revenues adequately contribute to the railroads' income. To accomplish this result, the level of intrastate rates may be a very vital factor to the "sound" operation of the Rio Grande
 
 
 [17]
 49 U.S.C. Sec. 10704(a)(2) & (4) provide:
 (2) The Commission shall maintain and revise as necessary standards and procedures for establishing revenue levels for rail carriers providing transportation subject to its jurisdiction under that subchapter that are adequate, under honest, economical, and efficient management, to cover total operating expenses, including depreciation and obsolescence, plus a reasonable and economic profit or return (or both) on capital employed in the business. The Commission shall make an adequate and continuing effort to assist those carriers in attaining revenue levels prescribed under this paragraph. However, a rate, classification, rule, or practice of a rail carrier may be maintained at a particular level to protect the traffic of another carrier or mode of transportation only if the Commission finds that the rate or classification, or rule or practice related to it, reduces or would reduce the going concern value of the carrier charging the rate. Revenue levels established under this paragraph should--
 (A) provide a flow of net income plus depreciation adequate to support prudent capital outlays, assure the repayment of a reasonable level of debt, permit the raising of needed equity capital, and cover the effects of inflation; and
 (B) attract and retain capital in amounts adequate to provide a sound transportation system in the United States.
 * * *
 (4) On the basis of the standards and procedures under paragraph (2) of this subsection, the Commission shall, within 180 days after the effective date of the Staggers Rail Act of 1980 and on an annual basis thereafter, determine which rail carriers are earning adequate revenues.
 
 
 [18]
 This view of the Staggers Act appears to place us somewhat at odds with that of the Sixth Circuit in Kentucky Utilities Co. v. ICC, 721 F.2d 537 (6th Cir.1983). There the court criticized the ICC for "recreat[ing]" section 11501(c) into a "de novo rate hearing not subject to previously articulated standards," stating that the "fickle methodology of the ICC" had been an abdication of the Commission's Congressionally-imposed duty. Id. at 544. Thus, under Sec. 11501(b)(3)(B), the state standards in effect at the time of the enactment of the Staggers Act still controlled. The court concluded:
 Thus, the ICC had no warrant to consider its own "interim guidelines" as the controlling, certified standard. It should not be understood by this holding, however, that the [Kentucky Railroad Commission] decision is totally beyond review by the ICC. Properly understood, the Court here merely finds that the ICC's dereliction of its initial responsibility under the Staggers Act to formulate a polestar ratemaking standard for use in certified state standards has established the standards employed by the KRC as the applicable rate formula herein, limiting the scope of the Commission's inquiry to the issue of whether the Kentucky standards were applied "in accordance with the provisions of this subtitle." Sec. 11501(c).
 721 F.2d at 544. We cannot agree with such construction of the Staggers Act, which denies the oversight responsibility of the ICC so clearly envisioned by the Congress. The Sixth Circuit's view ignores the statutory duty of the states to comply with federal "standards and procedures," and would require of the ICC an expertise in the techniques and theories of the 50 states. In addition, we note that the Staggers Act itself establishes certain standards that must be followed. See Wheeling-Pittsburgh Steel, supra, 723 F.2d at 354-55. The ICC may enforce such statutory standards in Sec. 11501(c) proceedings.
 
 
 [19]
 Our position here might diverge slightly from that of one other Court of Appeals. Oddly, the Third Circuit has held that the Staggers Act did not change the North Carolina standard. Wheeling-Pittsburgh Steel Corp. v. ICC, 723 F.2d 346, 353 (3d Cir.1983). The Third Circuit held, however, that North Carolina requires only that "the ICC must ... make the basis for its preemption order clear." Id. The court held that the ICC had done so. We believe that the Third Circuit's view rests on an incorrect view of the impact of the Staggers Act, which did fundamentally alter the review situation between the state authorities and the ICC. States previously were free to do as they pleased, so long as they did not discriminate against interstate commerce. Now, states are required to follow federal rules exclusively. Previously, the presumption was against preemption; that is no longer the case. We note, however, that even if the Third Circuit standard applies, little would be changed. In our view, the requirement of a clear statement of the Commission's reasoning essentially coincides with the traditional requirements of reasoned decision making to which we must hold the Commission here. See id
 
 
 [20]
 The ICC decision pointed to several reasons for the difference between its determination of revenue adequacy and that of the state agency:
 There are several reasons why the [Utah Commission's] determination of revenue adequacy differs from that made by this Commission. In the first place, we utilize return on investment (ROI) and not ROE [Return on Equity] to determine revenue adequacy. The use of ROI to establish revenue adequacy was prescribed in Ex Parte No. 393, Standards for Railroad Revenue Adequacy (not printed), served March 30, 1981. Second, this Commission's determination of revenue adequacy is based on betterment accounting and not depreciation accounting. Third, the use of so-called "comparable earnings" approach to establish a fair rate of return was not accepted in a number of decisions relating to the cost of railroad capital. See Ex Parte No. 381, Railroad Revenue Adequacy--1980 Determination, 365 I.C.C. 285 (1981).
 * * *
 [W]e also found in No. 38793, Petition for Review of a Decision of the Public Service Commission of West Virginia Pursuant to 49 U.S.C. 11501 (not printed), served March 18, 1982, that a comprehensive explanation and rationale was required for a State agency attempting to set rail rates at or near jurisdictional threshold levels, especially for revenue inadequate carriers.[*7
 
 
 *
 See also, No. 38946, Petition of Louisville and Nashville Railroad Company for Review of A Decision of The Public Service Commission Of Indiana (not printed), served November 24, 1982
 ICC Decision at 8-9 (JA 591-92).
 
 
 [21]
 See supra, note 16
 
 
 [22]
 49 U.S.C. Sec. 10101a(3) provides (emphasis added):
 In regulating the railroad industry, it is the policy of the United States Government--
 * * *
 (3) to promote a safe and efficient rail transportation system by allowing rail carriers to earn adequate revenues, as determined by the Interstate Commerce Commission;...
 
 
 [23]
 Class I railroads annually generate over $50 million in freight revenue. Class III railroads (such as the Salt Lake) annually generate under $10 million in freight revenue
 
 
 [24]
 Commissioner Simmons in a separate opinion stated that he "would not go so far as to say ... that the assailed rate level of $5.97 per ton (208.7 percent of variable costs) is a reasonable rate. Rather, it is simply the 'appropriate rate.' Given the limited time the agency has to consider these complex cases, all we can do is determine whether the assailed rate is not outrageously high." Id. at 11 (concurring opinion) (JA 594)
 
 
 [25]
 A year later, in a case involving special circumstances, the Commission also determined that rates constituting 213.8-255.7 percent of variable costs were reasonable. Trainload Rates on Radioactive Materials, Eastern Railroads, 362 I.C.C. 756, 775 (1980), aff'd, Conrail v. ICC, 646 F.2d 642 (D.C.Cir.), cert. denied, 454 U.S. 1047, 102 S.Ct. 587, 70 L.Ed.2d 488 (1981)
 
 
 [1]
 Section 54-7-15 provides: "Before any party ... who is dissatisfied with an order or decision of the [state] commission may commence legal action, the aggrieved party or person shall first [apply for rehearing]." UTAH CODE ANN. Sec. 54-7-15 (1953 & Supp.1981). This section, headed "Review or rehearing by commission--Application-Procedure-Prerequisite to court action" (emphasis supplied), sets out the first component of the in-state review process; the following section, headed "Certiorari--Findings conclusive--Exclusive jurisdiction of Supreme Court," continues:
 Within thirty days after the application for a rehearing is denied, or if the application is granted, within thirty days after the rendition of the decision on rehearing, the applicant or any party to the proceeding deeming himself aggrieved by such order or decision rendered upon rehearing may apply to the [Utah] Supreme Court for a writ of certiorari....
 Id. Sec. 54-7-16 (1953).
 
 
 [2]
 PSC Rule 19 provides that an interested party may apply for PSC rehearing and sets out rules for the rehearing process. See Rule 19 of the Rules of Practice of the Public Service Commission of Utah Secs. 19.1, 19.2-. 5. It further provides that "within thirty days after the rendition of the decision on rehearing, any party to the proceeding deeming himself aggrieved by such order or decision, may apply to the [Utah] Supreme Court for a writ of certiorari," id. Sec. 19.6, and concludes by designating the record on review in the state supreme court. Id. Sec. 19.7
 
 
 [3]
 It is, of course, a state's prerogative to specify rules, including administrative exhaustion requirements, governing access to the state's own tribunals. That, from all appearances, is precisely and only what Utah did in its PSC Rules of Practice and UTAH CODE ANN. Sec. 54-7-15
 Congress authorized the ICC to hear the complaints of rail carriers, but not of shippers, regarding state-prescribed intrastate rates. 49 U.S.C. Sec. 11,501(c) (1982). Therefore, UPL, if discontent with the PSC's decision, would be obliged to seek relief within Utah, and in accordance with Utah procedure, as set out in PSC Rule 19 and UTAH CODE ANN. Sec. 54-7-15. By contrast, UPL has petitioned this court for review of the ICC's decision, without asking for an ICC rehearing, because the federal law governing judicial review of ICC decisions requires no administrative rehearing petition. 49 U.S.C. Sec. 10,327(i).
 
 
 [4]
 Congress has written into federal statutes a variety of prior-resort-to-state-forum requirements. See, e.g., Age Discrimination in Employment Act of 1967, Sec. 14(b), 29 U.S.C. Sec. 633(b) (1982); Title VII of the Civil Rights Act of 1964, Sec. 706(c), 42 U.S.C. Sec. 2000e-5(c) (1982). Each of these statutes provides that when a state or local agency has authority to grant or seek relief against the prohibited discrimination, a grievant may not pursue federal relief before pursuing state remedies for 60 days, or until the termination of state proceedings, whichever comes first. See Oscar Mayer & Co. v. Evans, 441 U.S. 750, 99 S.Ct. 2066, 60 L.Ed.2d 609 (1979) (ADEA); Love v. Pullman Co., 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972) (Title VII). States may not tack onto this deferral rule procedural requirements of their own. See, e.g., Oscar Mayer & Co., supra (grievant is not required to commence state proceedings within time limits specified by state law)
 
 
 [5]
 UPL twice incorrectly states that Judge Wilkey's opinion in Carolina, C. & O. Ry. v. ICC, 593 F.2d 1305, 1312-13 & n. 43 (D.C.Cir.1979), recognizes "that state administrative remedies [must] be exhausted before seeking ICC review." Brief of Petitioner at 18; see Reply Brief at 8-9. Judge Wilkey quoted a legislative report containing an offhand reference to exhaustion; his opinion characterized Congress' intent with respect to the quoted reference as "less obvious." He added that "[o]f course, the precise effects of Congress' less obvious intentions ... are for another day." Moreover, the statutory provisions addressed in Carolina, the predecessor of current 49 U.S.C. Sec. 11, 501(d), is not the one at issue here. Section 11,501(d), relating to railroad petitions to increase rates, provides, not for total exhaustion of state remedies, but only for a 120-day period in which state commissions have exclusive jurisdiction. After 120 days, a railroad may switch to the federal track immediately without awaiting even an initial state commission decision. Significantly, the Carolina opinion is the only case UPL cites in support of its bold but erroneous statements that this court (or any other federal tribunal) regards full exhaustion of state administrative remedies, including rehearing petitions, as a "must" before the ICC listens to a railroad's complaint about an intrastate rate
 
 
 [6]
 The insubstantiality of UPL's reliance on PSC's provisional certification is all the more apparent when one compares the time-pressured temporary authorization that the ICC accorded to dozens of state agencies with the status of the Federal Rules of Civil Procedure. Even after long consideration by bench and bar, promulgation by the Supreme Court, and an opportunity for Congress to act, a Federal Rule can be tested, in an adversary proceeding, for consistency with the Rules Enabling Act. See Sibbach v. Wilson & Co., 312 U.S. 1, 9-10, 61 S.Ct. 422, 424-25, 85 L.Ed. 479 (1941)
 
 
 [7]
 Analogously, Congress has declared:
 Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of [judicial review] whether or not there has been presented or determined an application for ... any form of reconsideration[,] or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.
 5 U.S.C. Sec. 704 (1982) (Administrative Procedure Act). In some specific contexts, Congress has imposed a blanket agency rehearing petition prerequisite to judicial review of agency orders. See Federal Power Act, Sec. 313, 16 U.S.C. Sec. 825l (1982). In others, it has required an agency rehearing petition only as to objections not earlier urged before the agency. See National Labor Relations Act, Sec. 10(e), 29 U.S.C. Sec. 160(e) (1982). In still others, it has eschewed rehearing entirely. See 49 U.S.C. Sec. 10,327(i) (1982) (Interstate Commerce Act).